**In re HAYES LEMMERZ INTERNATIONAL, INC., et al.**

**No. 01–11490 MFW.**

United States Bankruptcy Court, D. Delaware.

March 28, 2006.

Julianne E. Hammond, Blank Rome LLP, Wilmington, DE, Susan Boswell, Quarles & Brady Streich Lang LLP, Tucson, AZ, for GECC.

Thomas G. McCauley, Zuckerman Spaeder LLP, Wilmington, DE, for Reorganized Debtors.

Stephen E. Glazek, Barris, Sott, Denn & Driker, P.L.L.C., Detroit, MI, for Reorganized Debtors.

## OPINION[1]

MARY F. WALRATH, Bankruptcy Judge.

Before the Court are the applications of General Electric Capital Corporation ("GECC") for allowance and payment of an administrative expense for damages allegedly sustained to machines it leased to Hayes Lemmerz International, Inc. ("Hayes"). After trial and briefing, the Court will grant the applications in part.

## I. BACKGROUND

On December 5, 2001 (the "Petition Date"), Hayes and several of its affiliates (collectively, the "Debtors") filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code. Prior to the filings, the Debtors were suppliers of wheels and other automotive components (e.g., brakes, drums, and rotors) to original equipment manufacturers. As automotive wheel suppliers, the Debtors manufactured, designed, and distributed cast aluminum and fabricated wheels. On May 14, 2003, the Court confirmed the Debtors' Joint Plan of Reorganization, which became effective on June 3, 2003.

Prior to the Petition Date, Hayes and GECC had entered into a Master Lease agreement, with amendment, dated December 28, 1992, and an addendum dated October, 15, 1993 (collectively "the Master Lease"), whereby GECC leased various computer numerically controlled ("CNC") machines (the "Machines") to Hayes. The Machines are metal-cutting machine tools used to shape the wheel (e.g., lathes) and to produce lug and valve holes in the wheel (e.g., drills). Each Machine is controlled by a central computer programmed in advance and is capable of making precision parts repeatedly. Machine operating performance is critical because wheels must be produced at precise specifications and tolerances.

In accordance with the Master Lease, various Schedules were subsequently executed between the parties pertaining to specific Machines.[2] The Machines were used by Hayes at six of its manufacturing plants.

Shortly after the Petition Date, Hayes rejected some of the Schedules of the GECC Machines. Because it experienced some problems recovering the Machines, GECC contacted Hayes to discuss future rejection and recovery of its Machines. (1/12/05 TR. at 42:12–25, 43:23–44:4.) The parties agreed that in the future, if Hayes intended to reject any other Schedules of GECC Machines, it would notify GECC in advance and would permit GECC to make arrangements for the deinstallation and removal of the Machines. (Id. at 43:23–45:19.) Notwithstanding that agreement, Hayes provided no advance notice to

---

**1.** This Opinion and the accompanying Findings of Fact ("FoF"), which describe in more detail the Court's findings about the condition of the machines at issue here, constitute the findings of fact and conclusions of law of the Court pursuant to Federal Rule of Bankruptcy Procedure 7052, which is made applicable to contested matters by Federal Rule of Bankruptcy Procedure 9014.

**2.** The Machine List attached to the Joint Pretrial Stipulation ("JPTS") contains a detailed listing of each of the Machines at issue, including machine number, description, serial number, Schedule number, and rejection date.

GECC and made its own arrangements for deinstallation and removal of the Machines, in many instances removing the Machines from the production line and moving them outside with no protection except a tarp. (*Id.* at 46:19–22. *See also* FoF 103, 118, 141, 158, 208.)

On various dates after filing bankruptcy, Hayes rejected eighteen Schedules covering fifty Machines.[3] On their return, many of the Machines were in terrible condition. In fact, Hayes acknowledges that twenty-six of the Machines were inoperable when they were returned to GECC. (Ex. D–276.) Many of the Machines were missing parts, because Hayes removed the parts and used them to keep its own machines operating. (*See, e.g.,* FoF 4, 160–63.)

Between April 30, 2003, and January 13, 2004, GECC filed several applications, amendments, and supplements for allowance and payment of an administrative expense arising from the rejected Machine Schedules.[4] Hayes filed objections to GECC's applications for allowance of an administrative expense. The Court held a five-day evidentiary trial in January and February, 2005. Post-trial briefs were submitted and this matter is ripe for decision.

## II. JURISDICTION

The Court has jurisdiction over this core proceeding pursuant to 28 U.S.C. §§ 1334 & 157(b)(2)(A), (B), & (O).

## III. DISCUSSION

The controversy in this case concerns the damages allegedly sustained by the fifty Machines. The parties dispute the extent, timing, and significance of those damages. GECC asserts two bases for an administrative expense under the Bankruptcy Code: section 365(d)(10)[5] and section 503(b). Hayes argues that GECC is not entitled to an administrative expense because it has not sufficiently proven any damages or when they occurred.

### A. Evidentiary Rulings

At the trial, several evidentiary rulings were reserved, pending briefing by the parties.

#### 1. Waiver of Defense

■ GECC asserts in its post-trial brief that Hayes has waived its argument that the liquidated damages provision in the Master Lease is an unenforceable penalty. GECC argues that Hayes raised this argument for the first time at trial and that, as an affirmative defense, it must have been pled prior to that time. *See, e.g., Pace Commc'ns, Inc. v. Moonlight Design, Inc.,* 31 F.3d 587, 594 (7th Cir.1994) (holding that party asserting penalty clause defense has burden of pleading and persuasion); *In re Snelson,* 305 B.R. 255, 262 (Bankr. N.D.Tex.2003) (holding that assertion that liquidated damages clause was an unenforceable penalty is an affirmative defense which is waived if not raised in response); *Public Health Trust of Dade County v. Romart Constr., Inc.,* 577 So.2d 636, 638 (Fla.Dist.Ct.App.1991) (same). *See also Charpentier v. Godsil,* 937 F.2d 859, 863 (3d Cir.1991) (holding that failure to raise

---

3. Hayes assumed other Schedules, which are not the subject of the instant dispute.

4. GECC's original application covered fifty-one Machines; GECC has withdrawn one Machine from consideration.

5. Section 365(d)(10) was renumbered section 365(d)(5) by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, which became effective on October 17, 2005. Because the Court took this matter under advisement before the amendment became effective, the numbering of the prior version is used.

affirmative defense in responsive pleading generally results in its waiver).

Hayes responds that this issue was already decided by the Court at the trial. (2/1/05 TR. at 105: 16–20.) At that time the Court ruled that the defense had been presented and preserved in the Joint Pretrial Stipulation (the "JPTS"). Further, Hayes asserts that it is not challenging the provision as an unenforceable penalty; rather, it is arguing that under section 365(d)(10) the Court may consider the equities of the case and determine that the damages provision should not be applied.

The JPTS stated as an issue of law to be determined at trial whether GECC is entitled to the liquidated damages under the Master Lease pursuant to section 365(d)(10). Therefore, the Court concludes that Hayes's argument that the liquidated damages clause should not be applied, under the equities of the case provision of section 365(d)(10), has been preserved and may be presented.

### 2. *Use of Depositions*

■ GECC seeks to introduce the depositions of several employees of Hayes who also testified live at the trial (Asberry, Almeida, Westerdale, and Little). Hayes objects, asserting that the depositions are not admissible under Rule 32 of the Federal Rules of Civil Procedure.

Rule 32 provides that depositions may be used under limited circumstances: (1) to impeach the live testimony of the deponent, (2) for any purposes if the deponent is an officer, director, or managing agent of the other party, and (3) for any purpose if the deponent is unavailable to testify live.

Hayes argues that the depositions do not fit any of these criteria. The depositions are being used substantively, not merely as impeachment. None of the deponents are officers, directors, or manag-

ing agents; they are merely plant personnel. Finally, none were unavailable to testify, as is evidenced by the fact that they did testify. Hayes notes that GECC could have admitted the depositions under Rule 32(a)(3)(E) by giving notice and proving that "exceptional circumstances exist as to make it desirable, in the interest of justice and with due regard to the importance of presenting the testimony of witnesses orally in open court." Hayes complains that GECC did not give any notice of its intent to use the depositions, thereby precluding Hayes's witnesses from explaining their testimony.

GECC counters that the depositions are admissible under Rule 801(d)(2)(D) of the Federal Rules of Evidence. That Rule provides that "a statement by a party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship" is not hearsay. GECC cites authority for the proposition that, if deposition testimony is otherwise admissible under Rule 801(d)(2)(D), it should not be excluded simply because the witness is available. *See Long Island Sav. Bank, F.S.B. v. United States,* 63 Fed.Cl. 157, 163–64 (Fed.Cl.2004) (holding that Rule 801(d)(2)(D) and Rule 32 provide independent grounds for admissibility of deposition testimony); *Globe Sav. Bank, F.S.B. v. United States,* 61 Fed.Cl. 91, 95–96 (Fed.Cl.2004) (same).

Hayes asserts that, while the depositions may not be hearsay, Rule 801(d)(2)(D) provides no independent basis for admission and the requirements of Rule 32 must still be met. *See Kolb v. County of Suffolk,* 109 F.R.D. 125, 128 (E.D.N.Y.1985).

The Court agrees with the reasoning of the cases cited by GECC, rather than the case cited by Hayes, and determines that the depositions should be admitted. The Court concludes that Rule 32 is not the

exclusive means by which depositions can be admitted and that Rule 801(d)(2)(D) is an independent basis for admissibility. The testimony relates to areas covered by the deponents' employment and therefore is admissible under Rule 801(d)(2)(D). The Court is not convinced by Hayes's argument that its witnesses should have been given an opportunity to explain their deposition testimony. Those witnesses were called by Hayes to testify live and could have explained their deposition testimony if Hayes felt it was incorrect or needed explanation.

### 3. *Expert Testimony*

■ At the trial GECC objected to the testimony presented by Hayes's expert, Frederick Kucklick. Hayes hired Kucklick as a consultant to review the documents and testimony of deponents and witnesses at the trial and to form an opinion of whether any of the Machines had been irreparably damaged. Kucklick had 25 years' experience in the design and manufacture of CNC and other wheel-making equipment similar to the Machines at issue in this case. As a result, the Court did qualify him as an expert in that field and allowed his testimony subject to arguments on the weight to be given it.

GECC argues that Kucklick's testimony and expert report is not even admissible pursuant to Rules 702 and 704 of the Federal Rules of Evidence. Rule 702 permits expert testimony only if it "will assist the trier of fact to understand the evidence or to determine a fact in issue." Fed.R.Evid. 702. Rule 704 does not allow an expert merely to tell the Court what result it should reach. *See, e.g., United States v. Simpson,* 7 F.3d 186, 188 (10th Cir.1993); *Burger v. Mays,* 176 F.R.D. 153, 156–57 (E.D.Pa.1997). Nor may an expert offer or opine on legal arguments. *See, e.g.,*

*Laverdi v. Jenkins Twp.,* 49 Fed.Appx. 362, 365 n. 1 (3d Cir.2002) (*citing United States v. Leo,* 941 F.2d 181, 196 (3d Cir. 1991)); *Evans v. Independent Sch. Dist. No. 25,* 936 F.2d 472, 476 (10th Cir.1991); *Peterson v. City of Plymouth,* 60 F.3d 469, 475 (8th Cir.1995). GECC argues that Kucklick was hired to opine whether any of the Machines at issue suffered a Casualty Occurrence, which is the legal issue that the Court must ultimately decide.

Hayes disagrees, noting that Kucklick only testified whether in his expert opinion any Machine was irreparably damaged, permanently rendered unfit for use, or worn out. Hayes contends that whether that constitutes a Casualty Occurrence was left for the Court to decide. Hayes argues, nonetheless, that Rule 704 does permit an expert to opine on the ultimate issue to be determined by the Court. *United States v. Polishan,* 336 F.3d 234, 242 (3d Cir.2003) ("Testimony about 'an ultimate issue to be decided by the trier of fact' is generally admissible" under Rule 704).

The Court agrees with Hayes that Kucklick's testimony is admissible. He did not testify to the ultimate decision the Court is required to make. Therefore, the Court did permit the testimony.

Even so, GECC argues that Kucklick's testimony is not probative of any fact at issue. Specifically, GECC asserts that Kucklick's opinion that the Machines were operable has no basis. Many of the inspection reports upon which his testimony is predicated provide no evidence that the Machines were operable because the inspector was not able to turn on the Machines. In addition, GECC notes that Kucklick relied only on evidence that supported his view that the Machines were operable while ignoring all evidence to the

contrary.[6]

The Court agrees with GECC's assessment of the lack of credibility of Kucklick's testimony. Kucklick did not personally inspect any of the Machines at issue. He concluded that Machines which could operate, even though they could not produce parts within the required tolerances, were not irreparably damaged and therefore had not suffered a Casualty Occurrence. (1/31/05 TR. at 139:22–140:13.) Further, while admitting that the Machines could not operate without certain of their vital parts, Kucklick testified nonetheless that they were not irreparably damaged. (*Id.* at 137:9–138:15.) Finally, Kucklick opined that he could not imagine a situation (other than nuclear irradiation or sinking to the bottom of the ocean) where a Machine would suffer a Casualty Occurrence, because he felt that a Machine could always be rebuilt or re-manufactured. (*Id.* at 134:24–135:16.) He did not, however, make any determination of what it would cost to repair any of the Machines or whether it made economic sense to do so. (*Id.* at 130:17–19, 138:12–15.)

The Court concludes that Kucklick's testimony regarding the condition of the Machines is not credible or helpful to the Court in making its ultimate decision. Kucklick did not analyze the information he reviewed or apply any scientific method to arrive at his conclusions. He was asked to do what the Court ultimately is required to do, namely, assess the witnesses' credibility and render a decision on the condition of the Machines. Kucklick provided no expertise or other insight into the issue that the Court was not otherwise able to glean from its own review of the exhibits

and testimony. Consequently, although the Court allowed Kucklick's testimony, it does not give much weight to that testimony in rendering this decision.

#### 4. *ACT Business Records*

GECC also objected to the admissibility of several exhibits proffered by Hayes which represent business records of a third party, ACT/Coleman, Inc. ("ACT"). (Exs. D–308, M–257.) GECC asserts that the documents are hearsay and that it did not get sufficient notice of Hayes's intent to use them.

Hayes asserts that the records are admissible hearsay because they are business records of ACT and therefore fall within Rule 803(6)'s exception to the hearsay rule. Hayes further argues that the Declaration of Fred Newburgh, the controller of ACT, establishes the foundation for admission under Rule 902(11) of the Federal Rules of Evidence. (Ex. D–308.)

The Court agrees with Hayes. Newburgh's Declaration establishes that the records were kept in the ordinary course of business, were made at the time of the occurrence of the events reflected therein, and were created as a part of ACT's regular business activities. Thus, the exhibits have been properly authenticated and are admissible as business records pursuant to Rules 803(6) and 902(11). The Court will, therefore, admit Exhibits D–308 and M–257.

### B. *Burden of Proof*

While Hayes concedes that many of the Machines were missing parts or inoperable when they were returned to GECC, it

---

**6.** An example is the conclusion reached by Kucklick that Machine 28 was operable because it could be turned on. In so concluding, however, Kucklick ignored the testimony of Maynard, who had actually inspected the Machine and described its poor condition in detail. (*See* FoF 121–22.) GECC notes further that Kucklick reached his conclusion before reviewing many of the depositions and before the trial was held, although he testified that his opinion was based on that testimony.

nonetheless asserts that GECC has failed to meet its burden of proving entitlement to an administrative expense. Specifically, Hayes contends that GECC must show that the lease was breached at particular points in time: within fifty-nine days after the Petition Date to recover under section 503(b)(1)(A) or between sixty days after the Petition Date and the date of rejection to recover under section 365(d)(10). Hayes argues that, because GECC has not shown *when* the Machines were damaged, the Court should not engage in conjecture or speculation in considering GECC's administrative expense applications.

GECC concedes that the party asserting an administrative expense must normally prove its entitlement. Nonetheless, it contends that the burden of proving when the damages occurred should be shifted in this case because Hayes is the only party in a position to have that knowledge. GECC claims that Hayes had firsthand knowledge of when the various breaches occurred, had the ability to keep accurate records, and has exclusive access to the relevant information. GECC contends that, if courts did not shift the burden under such circumstances, the result would be fundamentally unfair because debtors would be free to disregard their obligations as long as they failed to keep or produce records of their conduct.

■ Because administrative expense status permits a claimant to be paid before unsecured creditors "[t]he burden of proving entitlement to priority payment as an administrative expense ... rests with the party requesting it." *In re Hemingway Transp., Inc.*, 954 F.2d 1, 5 (1st Cir.1992).

■ The circumstances in this case, however, warrant different treatment. Because knowledge concerning the precise timing of the breach (i.e., damage to a particular Machine) was exclusively within the dominion and control of Hayes, it would be unfair to require GECC to shoulder this burden. "The ordinary rule, based on considerations of fairness, does not place the burden upon a litigant of establishing facts peculiarly within the knowledge of his adversary." *United States v. New York, New Haven & Hartford R.R. Co.*, 355 U.S. 253, 256 n. 5, 78 S.Ct. 212, 2 L.Ed.2d 247 (1957). *See also Thomas v. Lusk*, 27 Cal.App.4th 1709, 1717, 34 Cal.Rptr.2d 265 (Cal.Ct.App.1994) (citations omitted) ("The essential principle underlying this narrow exception to the usual allocation of proof is that the burden of proving an element of a case is more appropriately borne by the party with greater access to information" on that element.).

In this case, the Court concludes that Hayes is the most appropriate party to carry the burden of establishing when the Machines were damaged because it was in the best position to know those dates. This is supported by the parties' agreement. Under the Master Lease Hayes was required to keep records of any significant damage sustained by the Machines.[7] Fairness and equity support a shift because otherwise Hayes would be in a position to profit by making evidence unavailable. Consequently, the Court concludes that the burden is on Hayes to prove a breach did not occur at the relevant time under sections 503(b)(1)(A) and 365(d)(10).

7. For example, section V(e) of the Master Lease provides:
 Lessee will promptly and fully report to Lessor in writing if any Equipment is lost or damaged (where the estimated repair costs would exceed ten percent (10%) of its then fair market value), or is otherwise involved in an accident causing personal injury or property damage.
 (Ex. M–1 at § V(e).)

### C. Basis for Administrative Expense

#### 1. Section 503(b)(1)(A) Standard

GECC asserts that it does not matter when the breach occurred because it has an administrative expense claim under section 503(b)(1)(A).

■ Section 503(b) provides that administrative expenses include "the actual, necessary costs and expenses of preserving the estate." 11 U.S.C. § 503(b)(1)(A). "For a claim in its entirety to be entitled to first priority under [section 503(b)(1)(A) ], the debt must arise from a transaction with the debtor-in-possession.... [and] the consideration supporting the claimant's right to payment [must be] beneficial to the debtor-in-possession in the operation of the business." *Cramer v. Mammoth Mart, Inc. (In re Mammoth Mart, Inc.)*, 536 F.2d 950, 954 (1st Cir. 1976). *See also Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.)*, 181 F.3d 527, 532–33 (3d Cir.1999).

Thus, GECC asserts that, even if the damage did not occur within the time parameters of section 365(d)(10), it still is entitled to an administrative expense. *See In re Muma Servs., Inc.*, 279 B.R. 478, 490 (Bankr.D.Del.2002) (citations omitted) ("The majority of courts ... have held that section 365(d)(10) does not eliminate a lessor's right to apply for an administrative expense claim [under section 503(b) ] for the first fifty-nine days of a case.").

#### 2. Section 365(d)(10) Standard

GECC also asserts that it is entitled to an administrative expense under section 365(d)(10), which provides:

> The trustee shall timely perform all of the obligations of the debtor ... first arising from or after 60 days after the order for relief ... under an unexpired lease of personal property ... until such lease is assumed or rejected notwith-standing section 503(b)(1) of this title, unless the court, after notice and a hearing and based on the equities of the case, orders otherwise with respect to the obligations or timely performance thereof.

11 U.S.C. § 365(d)(10) (1994).

■ Section 365(d)(10) evinces Congress's intention to provide special protection to personal property lessors such as GECC. Unlike parties claiming administrative expense status under section 503(b), lessors claiming under section 365(d)(10) need not prove they conferred any benefit upon the estate.

Further, section 365(d)(10) requires that a debtor pay all sums and perform all obligations due under the lease without necessitating any action of the lessor. *See, e.g., In re Eastern Agri–Systems, Inc.*, 258 B.R. 352, 355 (Bankr.E.D.N.C.2000) ("§§ 365(d)(3) and (10) elevate rent claims above § 503(b) by creating an entitlement, not just to payment, but to actual performance under the lease. This interpretation is consistent with the legislative history of § 365(d)(10), which clearly states Congress's intent to give special protection to qualified lessors."); *In re Brennick*, 178 B.R. 305, 307–08 (Bankr.D.Mass.1995) (noting that sections 365(d)(3) and (10) are the only provisions in the Code "requiring the estate to perform the debtor's obligations at all, much less in a timely manner. Legislative history gives the reason for the command—the coercive nature of a lessor's extension of credit.")

Hayes argues that no claim is due under section 365(d)(10) because the elements of that section have not been established. Hayes asserts that it was required to perform only those obligations (e.g., maintenance and repair) that *first* arose within sixty days after the Petition Date but before rejection. Hayes asserts that no ad-

ministrative expense arises under section 365(d)(10) if the breach occurred prior to the sixtieth day after the Petition Date or if the damage occurred after rejection.

GECC argues that under the Master Lease many obligations, most notably the repair and maintenance obligations, arose continuously, every day that Hayes was in possession of the Machines. Therefore, GECC contends that breaches of those obligations did occur, continually, between the sixtieth day after the Petition Date and the rejection of the Schedules. It is Hayes's breach of those obligations which, GECC asserts, entitles it to an administrative expense under section 365(d)(10). Thus, GECC asks the Court to allow its administrative expense under both section 365(d)(10) and section 503(b)(1)(A).

To grant GECC's request for an administrative expense, the Court must find that: 1) damage occurred within the first fifty-nine days after the Petition Date *and* there was a benefit to the estate, or 2) damage occurred between the sixtieth day after the Petition Date and rejection. Where no benefit was conferred within the first fifty-nine days or where the damage first occurred pre-petition, no administrative expense arises.

### D. *Machines Damaged Pre–Petition*

■ GECC seeks allowance of an administrative expense for damage to nine Machines (Machines 3–11) located at the Gainesville, GA, facility. The Schedule for those Machines was rejected on January 15, 2002, which is within sixty days after the Petition Date. Therefore, GECC relies on section 503(b)(1) alone, because section 365(d)(10) is not applicable.

GECC argues that Hayes did not present any evidence of when these Machines were damaged. Therefore, GECC asserts that an administrative expense is due because Hayes engaged in an overall practice of cannibalizing parts from GECC Machines and otherwise failed to preserve the Machines' value (as confirmed by photographs of the Machines taken post-petition). (*See, e.g.,* FoF 4, 160–63.)

Hayes, however, did present evidence that all of these Machines were taken out of production prior to the Petition Date. (*See, e.g.,* FoF 225.) While acknowledging that seven of the nine Machines were damaged to the point they were inoperable (because the Machines were missing necessary parts), Hayes asserts that all damage occurred pre-petition. Therefore, Hayes argues that allowance of an administrative expense is not appropriate.

Hayes did present credible evidence that the damage to Machines 3–11 occurred pre-petition. (FoF 226–27.) GECC has offered no rebuttal evidence to establish that the damage occurred post-petition. Therefore, the Court concludes that no administrative expense can be allowed for Machines 3–11.[8] *See, e.g., In re Atlantic Container Corp.,* 133 B.R. 980, 992 (Bankr.N.D.Ill.1991) ("Only the costs of remedying damages to the Premises which actually occurred *after* the filing of the bankruptcy petition may be treated as administrative expenses.") (emphasis added). *See also United Trucking Serv., Inc. v. Trailer Rental Co. (In re United Trucking Serv., Inc.),* 851 F.2d 159, 164 (6th Cir.1988) (denying administrative expense status to claim for damages to trucks which occurred pre-petition).

---

**8.** Any claim GECC has for the pre-petition damage to Machines 3–11 is a general unsecured claim.

### E. *Failure to Give Notice of Move*

█ With respect to the remainder of the Machines, GECC asserts that various obligations under the Master Lease were breached post-petition. Specifically, GECC asserts that several of the Machines (Machines 13, 48, 50, and 51) were moved without notice to, or consent of, GECC.

Section V(d) of the Master Lease provides: "Lessee will keep the Equipment at the Equipment Location (specified in the applicable Schedule) and will promptly notify Lessor of any relocation of Equipment." GECC argues that Hayes breached this provision of the Master Lease. Specifically, GECC asserts that, without giving any notice, Hayes moved Machine 13 from Gainesville, GA, to Somerset, KY; Machine 48 from Huntington, IN, to Somerset, KY; and Machines 50 and 51 from Howell, MI, to a third-party storage facility.

Hayes admits that these Machines were moved, but it disputes the significance. Hayes contends that the Machines were moved pre-petition, and, thus, the breach did not first arise post-petition. GECC contends that the duty to notify arose on a continuous basis under the Master Lease; that is, that Hayes had a duty to notify GECC every day that a Machine was not in its original location.

The Court disagrees with GECC's contention and concludes that the notice obligation was first breached when a Machine was moved. Therefore, an administrative expense may be allowed only where the move occurred post-petition. Hayes established that the Machines were moved pre-petition. (FoF 38, 231, 243.) Consequently, the Court concludes that GECC is not entitled to an administrative expense for this breach.

### F. *Failure to Return on Expiration of Lease*

█ Several Machine Schedules were rejected by Hayes after the term of their lease had expired (as defined in the various Schedules). Specifically, the lease term for Machines 28 and 29 ended on February 14, 2003, while the Schedule was rejected four months later on June 13, 2003. (FoF 116.) Similarly, the lease for Machine 46 ended on October 14, 2002, but the Schedule was not rejected until eight months later on June 13, 2003. (FoF 216.)

GECC argues that the expiration of the term of a Schedule before rejection is relevant to the determination of its administrative expense because additional obligations under the Master Lease were triggered. In this regard, the Master Lease provides:

(a) Upon any expiration or termination of this Agreement or any Schedule, Lessee shall promptly, at its own cost and expense: (i) perform any testing and repairs required to place the affected units of Equipment in the same condition and appearance as when received by Lessee (reasonable wear and tear excepted) and in good working order for their originally intended purpose; (ii) if deinstallation, disassembly or crating is required, cause such units to be deinstalled, disassembled and crated by an authorized manufacturer's representative or such other service person as is satisfactory to Lessor; and (iii) return such units to a location within the continental United States as Lessor shall direct.

(b) Until Lessee has fully complied with the requirements of Section XI(a) above, Lessee's rent payment obligation and all other obligations under the Agreement shall continue from month to month notwithstanding any expiration or termination of the lease term. Lessor may terminate such continued leasehold in-

terest upon ten (10) days notice to Lessee.

(Ex. M–1 at § XI.)

GECC asserts that the return provision arose when the lease term ended. Because Hayes did not comply with the return obligations (before the Schedules were rejected), GECC argues that it has an administrative expense for the breach.

Hayes disagrees and asserts that any breach of the return obligations are rejection damages and, therefore, are not entitled to administrative expense status. 11 U.S.C. § 365(g) ("[T]he rejection of an executory contract or unexpired lease of the debtor constitutes a breach of such contract or lease ... immediately before the date of the filing of the petition."). *See also In re Templeton*, 154 B.R. 930, 935 (Bankr.W.D.Tex.1993) ("The Bankruptcy Code provides that damages from the rejection of an unexpired lease are treated as general unsecured claims, not as priority claims."); *Muma*, 279 B.R. at 487 (holding that return charges triggered by early return of leased containers did not arise on a current basis under the lease, but instead arose upon rejection and therefore were rejection damages). Hayes argues that the return provision under the Master Lease with GECC is analogous to the provision at issue in the *Muma* case.

The Court disagrees. In *Muma*, the payment due the lessor for the early return of the leased containers resulted from rejection of the lease. In this case the return provision in the Master Lease arose on expiration of the lease term, not on rejection. Thus, the return obligation arose before the Schedules were rejected.

Hayes argues, nonetheless, that under section XI(b) of the Master Lease, the lease term did not end until the return requirements were satisfied. Therefore, in Hayes's view, if the lease did not end, then the return obligation did not arise until the lease was rejected. This interpretation of the Master Lease is circular and without merit. Under Hayes's view, the lease would never end and Hayes would never have an obligation to return the Machines.

■ Section XI(b) of the Master Lease does, however, assist the Court in determining what damages were incurred by Hayes's failure to return the Machines at the conclusion of the lease. It requires that Hayes continue to pay rent until the Machines are returned notwithstanding the fact that the lease term ended. Consequently, it is evidence that the parties believed that the payment of rent compensated GECC for any damages arising from the failure to return the Machines in a timely manner. Therefore, the Court concludes that, while GECC is entitled to an administrative expense for Hayes's breach of the return obligations under the Master Lease for Machines 28, 29, and 46, it has already been compensated for that failure by the receipt of rent between the end of the lease term and the rejection of the applicable Schedule.

## G. *Failure to Store Machines Properly*

■ After the Petition Date, Hayes took several Machines out of production. In many cases this resulted from decreases in production or plant closures. Hayes argues that the process by which Machines were removed from production and stored did not result in a breach of the Master Lease. Hayes's witnesses testified that the Machines were disconnected, cleaned, moved outside by a professional rigger, and tarped.

GECC does not dispute that Hayes followed the process described above. GECC argues, however, that storing a CNC machine outdoors covered only by a tarp was inadequate to protect it. GECC

contends that the Machines should have been stored indoors in a warehouse. Because storing a machine outdoors exposes it to the elements, weather cycles, and changes in temperatures, GECC asserts serious damage can and did occur. This environment, GECC argues, is harmful to a machine, causing metal components to rust, electronic components to fail, and other damage to occur. Therefore, GECC asserts that Hayes breached its duty under the Master Lease to maintain the Machines when it stored those Machines outside.

As described above, a CNC machine consists of many parts including sheet metal, electrical components, gears, pulleys, and motors. Controlled by a computer and designed to produce a significant number of parts to precise specifications and within stated tolerances, a CNC machine is a delicate and valuable piece of machinery. Storing such a machine outside, covered only by a tarp, exposes the machine to the weather, changes in temperature and humidity, and can cause the hydraulic and electronic components to fail. (1/13/05 TR. at 91:20–92:04.) In addition, if the ways are not coated, they can become rusted, pitted, or scored, which will prevent them from making precision parts. (*Id.* at 85:08–86:03; M–232 at 109:16–110:22, 123:22–124:07.) While a tarp may offer some protection, the Court concludes that more was required to maintain the Machines properly.

Therefore, 'the Court concludes that Hayes breached its duty to maintain the GECC Machines by storing them outside. The breach of this obligation benefitted the estate by saving it storage costs and facility space while it stored the Machines outdoors at little or no cost. Therefore, the Court concludes that GECC is entitled to an administrative expense under sections 503(b) and 365(d)(10) for the following Machines: 20–24, 26–27, 29, 31–33, 36 and 44–46. (*See* FoF 103, 118, 141, 158, 208.)

### H. *Failure to Maintain the Machines*

 GECC asserts that Hayes had a duty to maintain the Machines. Section VII(a) of the Master Lease required Hayes to "maintain each unit of Equipment in good operating order, repair, condition and appearance in accordance with manufacturer's recommendations, normal wear and tear excepted." GECC argues that the duty to maintain was continuous and arose on a daily basis. Thus, GECC contends that, because the maintenance obligation remained due and owing every day Hayes was in possession of the Machines, the date it was first breached is irrelevant.

In contrast, Hayes argues that any alleged breach of the maintenance obligation became due and owing on the date it was initially breached. Therefore, Hayes asserts that, if the duty to maintain was not first breached sixty days after the Petition Date, then GECC may not recover an administrative expense under section 365(d)(10).

Historically, Hayes conducted preventive maintenance under various programs implemented at the plants. (*See, e.g.,* FoF 49, 87–93, 173–76.) In some cases, these programs were operated, monitored, and managed by the CNC manufacturer. (*See, e.g.,* FoF 87–93.) Although the programs varied, the maintenance generally included a daily, weekly, monthly, quarterly, and semi-annual component. (FoF 89.) For example, under the daily program at the Somerset, KY, facility, each machine was shut down every two hours for a thorough cleaning. (FoF 174.) The quarterly program at the La Mirada, CA, facility involved taking apart guards, inspecting belts and bearings, changing lubrication

oils, and testing the ball bar to determine if any adjustments were required to produce a wheel to specification. (FoF 91.)

GECC presented evidence establishing that these programs were significantly downgraded or eliminated after the Petition Date and that the change was precipitated by maintenance worker layoffs and the need to cut costs. (FoF 21, 94–98, 177–78.) Additionally, the maintenance reports kept by Hayes show that after the Petition Date Hayes ceased performing maintenance on numerous GECC Machines. (*See, e.g.,* FoF 21, 75, 139, 157.)

Hayes disputes the conclusion GECC draws from the lack of maintenance records. Hayes states that a lack of records does not mean maintenance programs ended. For example, a Machine may be inspected and nòt require any work, in which case no record is kept. Similarly, if a Machine is repaired without the need for shutdown, or is pulled from a production cell, there may be no notation on the maintenance report. Hayes asserts that at some unspecified time it simply stopped keeping records of maintenance, although maintenance was being performed. Hayes contends that preventive maintenance continued after the Petition Date and ceased only when a Schedule was rejected.

The Court rejects this contention given the overwhelming evidence to the contrary. The Machines were generally in terrible condition when they were returned to GECC. (*See, e.g.,* FoF 15, 24, 35, 42, 45, 68, 79–83, 105–08, 121–28, 143–51, 161–63, 211–12, 248.) Hayes's maintenance records only contain evidence of sporadic repairs being performed after the Petition Date on the GECC Machines. (*See, e.g.,* FoF 21, 75, 101, 139, 157.) No invoices evidencing repairs were presented. Without any such corroborative evidence, and given the deplorable condition of the Machines on their return, Hayes's bald assertions that it maintained the Machines are, quite simply, not credible.

Hayes contends nonetheless that only a complete cessation of preventive maintenance for ten to twelve months would result in damage to a Machine. Consequently, Hayes asserts that the lack of preventive maintenance does not establish that a Machine was not in good operating order (normal wear and tear excepted).

Hayes's arguments are unavailing. Hayes initially had extensive preventive maintenance programs. If that were unnecessary, the Court cannot conceive why Hayes paid for it. The evidence further establishes that, as Hayes faced financial difficulties, the maintenance programs were reduced to a material degree. This was a breach of Hayes's obligation to maintain the Machines.

Further, there was credible evidence that the lack of maintenance did result in injury to the Machines. CNC machines are precision machines. In the wheel making process, the lathes and drills produce aluminum chips as waste. (1/31/05 TR. at 84:22–85:15.) If the chips are not removed, they can accumulate inside the covers and under the way wipers and score or pit the ways which adversely affects the precision of the Machine. (1/14/05 TR. at 57:11–58:04; Ex. M–232 at 108:07–110:22.) If a way becomes pitted, the way and the parts that move on the way must be reground. (1/31/05 TR. at 145:24–146:25.) There was substantial evidence that many of the Machines had pitted ways and similar problems caused by the failure to maintain them. (*See, e.g.,* FoF 24, 68, 82, 121, 125, 145, 248.) Thus, the Court concludes that the failure to maintain the Machines as required by the Master Lease did result in substantial damage to them.

Further, the Court agrees with GECC's contention that the maintenance obligation

arose on a daily basis. Consequently, the "first" breach of the maintenance obligation occurred each day maintenance was not done. In addition, Hayes's breach of that obligation benefitted the estate by saving it the cost of continuing the maintenance programs. Thus, the Court concludes that GECC is entitled to an administrative expense under sections 503(b) and 365(d)(10) for Hayes's breach of its maintenance obligation under the Master Lease for the following Machines: 2, 12–13, 16–24, 26–29, 31–33, 37–46, 48, and 50–51. (*See* FoF 21, 75, 101, 139, 157.)

### I. *Failure to Repair the Machines*

Section VII(a) of the Master Lease provides: "Lessee will, at its sole expense, maintain each unit of Equipment in good operating order, repair, condition and appearance in accordance with manufacturer's recommendations, normal wear and tear excepted." Two separate and distinct obligations resulted from this lease provision: a duty to repair and a duty to maintain. GECC contends that, in addition to failing to maintain the Machines, Hayes failed to repair Machines that became damaged. GECC asserts that Hayes's duty to repair the Machines arose every day, even if the damage occurred pre-petition.

#### 1. *Pre–Petition Damage*

Hayes argues that the elements of section 365(d)(10) have not been established for Machines damaged pre-petition. First, Hayes asserts that it was required to perform only those obligations (e.g., maintenance and repair) that *first* arose sixty days after the Petition Date but before rejection. *See, e.g., In re Pan American Airways Corp.*, 245 B.R. 897, 899 (Bankr. S.D.Fla.2000). Hayes asserts that no administrative expense arises under section 365(d)(10) if the breach occurred prior to

the sixtieth day after the Petition Date or if the damage arose after rejection.

GECC responds that, even if damages arose pre-petition, they could nonetheless merit administrative expense status under section 365(d)(10). It reasons that, if the lease was rejected within fifty-nine days, Hayes has no obligation under section 365(d)(10). If Hayes did not reject the lease within that time, however, GECC contends that Hayes became obligated to perform the lease in its entirety, including the obligation to repair Machines that were damaged pre-petition.

■ The Court disagrees with GECC's conclusion. Section 365(d)(10) limits the recovery of an administrative expense to obligations "*first* arising from or after 60 days after the order for relief." 11 U.S.C. § 365(d)(10) (emphasis added). An obligation to repair a machine that was damaged pre-petition did not first arise during any post-petition period; it first arose pre-petition. Therefore, the Court concludes that claims for damages that occurred pre-petition or within the first sixty days of the case are not entitled to administrative priority under section 365(d)(10).

GECC asserts, nonetheless, that the date the Machines were damaged is irrelevant under section 365(d)(10), because that date is not necessarily the date payment is due for the breach. GECC relies on the Third Circuit decision in *In re Montgomery Ward Holding Corp.*, 268 F.3d 205 (3d Cir.2001). In *Montgomery Ward,* the Third Circuit held that a lessor's claim for payment of property taxes that had accrued pre-petition but were invoiced to the debtor-lessee post-petition, pre-rejection, was entitled to administrative status under section 365(d)(3) because the lease required payment when a bill was presented, not when the taxes were incurred. 268 F.3d at 209. GECC argues that just as the date taxes accrued was irrelevant in

*Montgomery Ward,* so too the date the damage occurred to the Machines must also be irrelevant.

GECC's argument goes too far. The Third Circuit in *Montgomery Ward* did not hold that the accrual date is irrelevant as a general matter; rather, it held that a lease obligation cannot "first arise" under section 365(d)(3)[9] until it becomes legally enforceable against the lessee. In *Montgomery Ward,* the debtor-lessee argued that because a property tax liability "arises" on a per diem basis and not when it is assessed or payable, the pre-petition tax obligations did not "first arise" during the post-petition, pre-rejection period. The Third Circuit explained that an obligation under a lease is "something that one is legally required to perform under the terms of the lease and that such an obligation arises when one becomes legally obligated to perform." *Montgomery Ward,* 268 F.3d at 209. Because the debtor-lessee was not obligated to pay the taxes until receipt of the invoice from the lessor, which occurred post-petition, the Third Circuit found no basis in the text of section 365(d)(3) for limiting the lessor's administrative claim to those taxes accruing post-petition. *Id.* Consequently, the Third Circuit concluded that the entire tax bill was an obligation "first arising" post-petition and was payable in full as an administrative expense. *Id.* Under *Montgomery Ward,* it is clear that the Court must examine the terms of the Master Lease to determine what performance was legally required and when.

GECC argues further, however, that the duty to repair is continuous and, therefore, the date it *first* arose is irrelevant. The Court rejects GECC's argument. The date the duty to repair was first breached is relevant because it establishes when the obligation to repair first became due. *Montgomery Ward,* 268 F.3d at 209. Under the Master Lease, Hayes was obligated to repair a Machine when it was damaged. Therefore, an administrative expense is appropriate under section 365(d)(10) if damage first occurred more than sixty days after the Petition Date, but before rejection. Moreover, an administrative expense is appropriate under section 503(b)(1)(A) if the damage first occurred within fifty-nine days after the Petition Date and a benefit was conferred on the estate. Accordingly, where damage occurred post-petition and pre-rejection an administrative expense may be due.

### 2. *Post–Petition Damage*

GECC presented evidence that numerous Machines were damaged post-petition. Specifically, there was substantial evidence presented that many GECC Machines sustained direct damage to various component parts that were not repaired: e.g., way covers, doors, way wipers, sheet metal, CRT and operator panels, slides, cables, ducts, boards, motors, chip augers, transformers, electrical wires and cabinets, chip conveyors, coolant tanks, upper turret X axes, ball screws, and headstock pulleys. (*See, e.g.,* FoF 15, 24, 35, 42, 45, 79–83, 105–08, 121–28, 143–51, 161–63, 211–12, 248.) Keeping the GECC Machines in a state of disrepair benefitted Hayes by avoiding repair costs.

The Sixth Circuit concluded in similar circumstances that a lessor is entitled to an administrative expense under section 503 for the failure of a debtor/lessee to repair equipment under lease.

[The Lessee's] asserted failure to maintain and repair the trailers in accord

---

9. The distinction between section 365(c)(3) and section 365(d)(10) is immaterial in this case.

with the lease obligations allowed [the Lessee], the debtor, to use the money saved and not paid for [the Lessor's] benefit as contemplated under the lease, to continue its operations. This breach and misuse of [the Lessor's] trailers did benefit the bankrupt estate. Accordingly, the damages under the breached lease covenant, to the extent that they occurred post-petition, provided benefits to the bankrupt estate and were properly accorded priority under § 503.

*United Trucking,* 851 F.2d at 162. *See also Atlantic Container Corp.,* 133 B.R. at 992 ("By failing to repair and maintain the Premises, the [debtor] and the Trustee may have spared the estate substantial amounts of money which could then have been used for other purposes, such as paying employees and trade vendors in an attempt to reorganize.")

▮▮▮ GECC asserts that an additional breach of the repair obligation occurred when Hayes stripped the GECC Machines of parts. In addition to being a breach of the Master Lease's obligation to keep the Machines in good repair, GECC asserts that stripping parts from its Machines constituted a tort. Damages arising from a post-petition tort committed by a debtor are entitled to administrative expense status. *See, e.g., Reading Co. v. Brown,* 391 U.S. 471, 485, 88 S.Ct. 1759, 20 L.Ed.2d 751 (1968) (holding that damages resulting from fire caused by receiver's negligence were administrative expenses).

Hayes seeks to distinguish this case by arguing that *Reading* does not apply to contract claims. *See, e.g., Hemingway Transp.,* 954 F.2d at 7 ("We are aware of no authority that the *Reading* ... exception encompasses a right to payment originating in a prepetition contract with the debtor."). The Court rejects this argument. GECC's claim for conversion of its property in no way "originates" in the

Master Lease. That Hayes's conversion of GECC's property might also have constituted a breach of the Master Lease does not deprive it of its status as an independent tort. *Id.* at 7 n. 6 (noting that a "distinct postpetition injury" arising independently of any contract with the debtor would provide an "arguable basis" for an administrative expense award under *Reading*).

Hayes alternatively argues that, in order to be an administrative expense under *Reading,* the tort must have arisen from the Debtors' business operations. *See, e.g., In re Unidigital, Inc.,* 262 B.R. 283, 289–90 (Bankr.D.Del.2001) (denying administrative claim under *Reading* where the "alleged tort ... was not committed during the conduct of business which benefitted the estate and other creditors"). Hayes asserts that the Machines from which it stripped parts were removed from production pre-petition. Therefore, the tort did not arise from the post-petition operations of the Debtors' business.

To the extent parts were stripped from the Machines pre-petition, the Court agrees. To the extent parts were stripped from the Machines post-petition, however, the tort did arise from the Debtors' business operations. In fact, by using parts from GECC's Machines to repair its own, Hayes's actions helped sustain its business, and an administrative expense is warranted.

Hayes's employees admitted that they engaged in part-stripping post-petition to keep Hayes's machines operating in production. (FoF 4, 160–63.) Substantial evidence was presented showing Machines missing computer boards, gear boxes, servo axes, motors, headstock shafts, guards, tables, spindles, spindle drives, tool changers, turrets, ball screws, electrical parts (controllers, CRT screens, and MDI panels), and blowers. (*See, e.g.,* FoF 35, 42,

105–07, 121, 125, 143–45, 147–49, 156, 162, 190, 206.) Hayes attempts to justify its actions by asserting that it is common in the industry for parts to be removed from one machine and placed on another to keep it running.

Hayes's justification is lacking. There was no legal right for Hayes to strip parts from the GECC Machines which it did not own. Hayes's admission that it used those parts to keep machines it owned operating establishes that GECC's parts benefitted the estate by reducing or eliminating the need to purchase parts or new machines.[10] Thus, the predicate to section 503(b) relief has been met: a benefit was conferred on the estate.

■ Stripping parts from the Machines and failing to replace defective parts on the Machines was also a breach of the repair obligation under the Master Lease. Therefore, the Court concludes that GECC is entitled to an administrative expense under sections 503(b) and 365(d)(10) for stripping parts from, and failing to repair, the following Machines: 2, 12–13, 16–24, 26–29, 31–34, 36–37, 44–45, and 48.

### J. *Failure to Pay Stipulated Loss Value*

■ GECC argues that section 365(d)(10) mandates the payment of the Stipulated Loss Value (the "SLV") of the Machines because that is an obligation under the Master Lease. (Ex. M–1 at § XII.) The payment of the SLV is required by the Master Lease upon a Casualty Occurrence or a breach of any other obligation of the Master Lease. Because Hayes breached its duty to maintain and repair the Machines, GECC contends that Hayes is obligated to pay the SLV for those Machines.

Hayes responds that the SLV is not an obligation under the Master Lease; instead, it is merely a *remedy* for breaches of the Master Lease. As such, section 365(d)(10) does not mandate that it be paid. Hayes relies on the reasoning of the Court in *In re Food City, Inc.*, which dealt with a similar fee due under a lease. 95 B.R. 451 (Bankr.W.D.Tex.1988). The *Food City* Court held:

> First of all, the "obligation" in question is not to pay the fee, but to keep the store open, i.e., not to "go dark." It was that obligation which, when breached, raised the issue of the charge. The fee itself is merely the *remedy* for failure to perform, i.e., for not keeping the store open and operating. In this regard, the "going dark" fee differs fundamentally from other rights to payment under the lease. Rents, for example, are not a remedy for breach of an obligation. They *are* the obligation. The same is true for such other items as common area maintenance charges, utilities, and even taxes.... Section 365(d)(3) may compel timely performance of obligations due under the lease, such as the obligation to pay rent. It does not, in this court's view, compel the timely payment of the default remedy for failure to timely perform an obligation due under the lease, such as the obligation to keep the store open.

*Id.* at 455–56.

The Court agrees with Hayes's argument and the reasoning of the Court in *Food City*. The payment of the SLV is not an obligation Hayes was required to perform under the Master Lease. Rather, it is a remedy for Hayes's failure to perform its obligations under the Master Lease to maintain and repair the Machines.

---

**10.** There was evidence that, because of its financial difficulties, Hayes was not able to obtain replacement parts for its own machines. (*See, e.g.,* FoF 2–4.)

### K. *Calculation of Damages*

GECC asserts that, under section 365(d)(10), a lessor's remedies are determined by the agreement between the parties. Thus, GECC contends that the Court should refer to the Master Lease to calculate damages. In contrast, Hayes argues that the damages provided by the Master Lease do not apply on two grounds. First, Hayes asserts that the conditions defined under the Master Lease have not been met. Alternatively, Hayes argues that the damages provision should not be applied because it does not approximate actual damages and, thus, is inequitable.

The remedy provided under the Master Lease is the amount of the SLV which results from a Casualty Occurrence or as liquidated damages.

### 1. *Stipulated Loss Value*

The SLV is determined from tables attached to each Schedule. Depending on when a Machine is returned during the term of the lease, the table provides a percentage of the original Machine cost that is due. Utilizing the tables, GECC has calculated that it has a claim of $8,112.893.59 for the fifty Machines.

#### a. *Casualty Occurrence*

 Under the Master Lease, Hayes was required to pay GECC the SLV if a Machine suffered a Casualty Occurrence. Section VIII of the Master Lease defines a Casualty Occurrence as follows:

> Lessee shall promptly and fully notify Lessor in writing if any unit of Equipment shall be or become worn out, lost, stolen, destroyed, irreparably damaged in the reasonable determination of Lessee, or permanently rendered unfit for use from any cause whatsoever (such occurrences being hereinafter called "Casualty Occurrences").

(Ex. M–1 at § VIII.)

GECC contends that fifteen Machines [11] suffered a Casualty Occurrence because they were "worn out." GECC asserts the term "worn out" is not defined in the Master Lease and, therefore, the plain meaning of the term should apply. *See, e.g., Biase v. Congress Fin. Corp. (In re Tops Appliance City, Inc.)*, 372 F.3d 510, 514 (3d Cir.2004).

The plain meaning of "worn out" in GECC's view is a Machine severely deteriorated or a Machine (or its critical parts) that requires remanufacture or rebuilding. In support, GECC relies on the dictionary usage: "worn out" is defined as "exhausted or used up by or as if by wear." *See* Merriam–Webster Online Dictionary, http://www.m-w.com/dictionary/wornöut (last visited Mar. 27, 2006); Roget's New Millennium Thesaurus, First Edition (v 1.1.1), http://thesaurus.reference.com/search?q=wornöut (last visited Mar. 27, 2006). Its synonyms include "overused," "deteriorated," "dilapidated," "in disrepair," and "run down." *Id.* GECC contends, consequently, that even though a Machine is operable, if it is in disrepair, it has suffered a Casualty Occurrence. GECC asserts that this interpretation is reasonable and gives effect to all the terms of the Master Lease. *See, e.g., Bond Purchase, L.L.C. v. Patriot Tax Credit Props., L.P.*, 746 A.2d 842, 855 (Del.Ch.1999); *Radio Corp. of Am. v. Philadelphia Storage Battery Co.*, 6 A.2d 329, 334 (Del.1939).

Hayes agrees with GECC's dictionary definition of worn out, but disagrees with the use of its synonyms to further define the term. Hayes contends that the definition of "worn out" (namely, "exhausted or used up by or as if by wear") means more

---

**11.** Machines 13, 16, 18, 19, 28, 29, 31, 32, 33, 34, 36, 44, 45, 50, and 51.

than simply broken or missing a part and that reliance on synonyms like "in disrepair" and "overused" is misplaced. Hayes asserts that if a Casualty Occurrence could exist when a Machine was merely "in disrepair," then a new Machine missing one part would be "worn out" even if the part was easily replaceable at minimal cost.[12]

Hayes argues instead, under the maxim *noscitur a sociis*,[13] that the Court should find meaning in the term "worn out" from the accompanying words in the Master Lease. *See, e.g., New Castle County, Del. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 243 F.3d 744, 751 n. 4 (3d Cir.2001) (noting that *noscitur a sociis* "means that general and specific words capable of analogous meaning when associated together take color from each other so that the general words are restricted to a sense analogous to the specific words"). Hayes asserts that, because the other words used in the Master Lease to define a Casualty Occurrence ("lost, stolen, destroyed, irreparably damaged, or permanently rendered unfit for use") all suggest that the Machine is beyond recovery, "worn out" must be interpreted with the same understanding or meaning. Therefore, Hayes argues that, for a Casualty Occurrence to occur, GECC must show that a Machine's condition was so poor that it was impossible to restore.

The "[C]ourt should start with the words ['worn out'] and begin with the plain meaning." *Biase*, 372 F.3d at 514. The Court finds instructive the dictionary definition, which is not disputed by the parties: "worn out" means "exhausted or used up by or as if by wear." "Exhausted" is

defined as "consume[d] *entirely:* USE[D] UP" or "tire[d] *extremely* or *completely.*" *See* Merriam–Webster Online Dictionary, http://www.m-w.com/dictionary/exhaust (last visited Mar. 27, 2006) (emphasis added). Thus, the plain meaning suggests that a Machine must be "exhausted" or "used up" to be considered "worn out."

Further, the Court agrees with Hayes that the use of "worn out" in the context of the Master Lease suggests more than mere disrepair, i.e., that a Machine must be damaged to such an extent that it is beyond recovery or repair. The words used in conjunction with "worn out" (i.e., "lost, stolen, destroyed, irreparably damaged, or permanently rendered unfit") all imply a Machine beyond recovery. Because " 'a word is known by the company it keeps,' and this rule of construction is 'wisely applied where a word is capable of many meanings,' " the Court finds instructive the context in which the words appear. *SBC Inc. v. FCC*, 414 F.3d 486, 506 (3d Cir.2005) (quoting *Jarecki v. G.D. Searle & Co.*, 367 U.S. 303, 307, 81 S.Ct. 1579, 6 L.Ed.2d 859 (1961)).

Applying the plain meaning described above, the Court concludes that Machine 29 was the only one that was worn out or damaged beyond repair or rebuild. (FoF 125–27.) While GECC has made a showing that many of the other Machines were inoperable because they were missing (or had damaged) parts (*see* Exhibit D–276), this alone sets the bar too low for a Casualty Occurrence. Thus, the Court concludes that there is insufficient evidence to

---

12. For example, Hayes notes that Machine 17 had a damaged transformer that could have been replaced at a cost of $1,000. If this were considered a Casualty Occurrence, Hayes asserts the SLV due to GECC would be $342,980. GECC, however, is not seeking the SLV for Machine 17.

13. The doctrine means "it is known by its associates." *See Black's Law Dictionary* 1084 (7th ed.1999).

support a Casualty Occurrence for any other Machine.

### b. *Liquidated Damages*

■ In addition to a Casualty Occurrence, the Master Lease provides that the SLV will be due as liquidated damages for breach of the lease:

> (a) Lessor may in writing declare this Agreement in default if: Lessee breaches its obligation to pay rent or any other sum when due and fails to cure the breach within (10) days: Lessee breaches any of its insurance obligations under Section X; *Lessee breaches any of its other obligations* and fails to cure that breach within (30) days after written notice thereof. . . .

> (b) After default . . . Lessee shall, without further demand, forthwith pay to Lessor (i) as liquidated damages for loss of a bargain and not as a penalty, the Stipulated Loss Value of the Equipment (calculated as of the rental next preceding the declaration of default).

(Ex. M–1 at § XII (emphasis added).) GECC argues that, because Hayes breached the Master Lease as found above, the damages under the Master Lease are calculated at the SLV.

GECC asserts that the SLV is a valid liquidated damages provision enforceable under Delaware law. *See, e.g., Wilmington Housing Auth. v. Pan Builders, Inc.*, 665 F.Supp. 351, 354 (D.Del.1987) (holding that liquidated damages provision is valid where (1) the anticipated damages from a breach are uncertain or incapable of calculation and (2) the amount fixed is a reasonable forecast of such damages); *Piccotti's Restaurant v. Gracie's, Inc.*, 1988 WL 15338 at *2–3 (Del.Super. Feb. 23, 1988) (enforcing "reasonable" liquidated damages provision "even though the plaintiff ha[d] not proven any actual damages pur-

suant to [the] breach"). GECC argues that both criteria have been met: actual damages were not capable of being calculated at the inception of the Master Lease and the SLVs were a reasonable calculation of the depreciation in value of the Machines.

Hayes contends, however, that the SLV is not an appropriate measure of damages for its breaches because such an award would be inequitable. In support, Hayes relies on the express language of section 365(d)(10) which provides that a debtor may be relieved of compliance with a lease obligation in light of "the equities of the case." Hayes asserts that, because the SLV is based on GECC's capitalized machine cost, it does not account for, or correlate to, the actual condition of any Machine. Thus, Hayes argues it would be inequitable to award the SLV because it is not sufficiently related to any actual damages sustained by GECC.

Hayes contends that the proper measure of damages is the cost of replacing parts or repairing the Machines. *See, e.g., United Trucking*, 851 F.2d at 164 (affirming the bankruptcy court's measure of damages as the "reasonable cost of making the repairs required under the lease"); *Atlantic Container*, 133 B.R. at 992 ("Only the costs of remedying damages to the Premises which actually occurred after the filing of the bankruptcy petition may be treated as administrative expenses."). Hayes asserts that to allow the SLV would provide GECC with a windfall; for example, a Machine in need of a $1,000 replacement part could result in an SLV of $342,980.[14] Therefore, based on the equities of the case, Hayes argues that the SLV should not be used as the measure of damages.

GECC asserts that the Court must not consider the equities of utilizing the SLV.

---

14. *See* n. 12, *supra.*

GECC argues that the equities of the case is a prospective remedy only, and therefore, Hayes's request for retroactive application is misplaced. GECC argues that, under section 365(d)(10), Hayes was required to seek equitable relief during the first sixty days of the bankruptcy case (not two or three years after the Petition Date). *See, e.g., In re Midway Airlines Corp.,* 406 F.3d 229, 240 (4th Cir.2005) (holding that no retroactive equitable adjustment of the rent obligation was proper because the trustee "cannot remain idle after the sixty-day grace period, neither seeking modification of nor fulfilling his obligations under the lease, and then ask for a retroactive modification of his obligations when the lessor seeks an administrative expense"); *In re The Elder–Beerman Stores Corp.,* 201 B.R. 759, 764 (Bankr.S.D.Ohio 1996) ("where the debtor has allowed the 60–day abeyance period to lapse yet fails to challenge or fulfill its obligations, the court is reluctant to retroactively apply any equitable analysis under § 365(d)(10). To do so would be to dilute the duties Congress intended to impose upon the debtor when the 60–day period was created.").

GECC's argument is unconvincing. The cases cited by GECC are distinguishable. In both cases, the debtor sought a retroactive reduction in rent (which was well-known at the inception of the case). In this case, however, Hayes was not in a position to seek an equitable modification in advance. Hayes did not know in the first sixty days of the case that it would reject the leases or what the condition of the Machines would be on rejection.

Further, a rigid rule limiting equity to prospective application only, as GECC suggests, goes too far and eviscerates the language and spirit of the statute. Rather, the Court concludes that an equitable analysis is permissible. *See, e.g., Computer Sales International, Inc. v. Federal-Mogul, Inc.,* 331 B.R. 160, 168 (D.Del.2005) (affirming bankruptcy court's retroactive application of equities of the case under section 365(d)(10) to require debtor to pay only pro-rated rent for month in which equipment lease was rejected).

Applying that analysis to this case, the Court concludes that the equities do mandate that the SLV not be used as the measure of damages. For example, the SLV for the entire fifty Machines is $8,112,893.59 while GECC's expert witness testified that, if they had been properly maintained and repaired, the value of the Machines on their return to GECC would have been $3,040,000. (*See* Exhibit M–108.) Thus, the SLV is almost three times the actual damages.

Consequently, the Court will award only the actual damages sustained. *See, e.g., United Trucking,* 851 F.2d at 164 (concluding that only damages which actually occurred post-petition were administrative expenses but allowing estimate of repairs, rather than actual repair bills); *Atlantic Container,* 133 B.R. at 992 (holding that multiplying total repairs by percentage of lease occurring post-petition was not proper measure of post-petition damages and requiring evidentiary hearing on actual post-petition damages).

### 2. *Hypothetical Machine Value*

██ As an alternative to the SLV, GECC argues that its actual damages can be calculated by comparing the value of the Machines when they were returned to the value they would have had on that date if they had been properly maintained. GECC presented the testimony of an expert, Thomas Hazelhurst, who gave an opinion on the orderly liquidation value ("OLV") and fair market value ("FMV") for the Machines, assuming they had been properly maintained. (*See* 1/12/05 TR. at 90–111; Exhibit M–108.)

Hazelhurst did not actually inspect any of the Machines or review the Machine inspection reports. Instead, he assumed the Machines were functional, complete, in reasonable condition, not in need of repair, used for normal hours, subjected to proper maintenance, and experienced ordinary wear. (*Id.*) Also, Hazelhurst considered the actual age of the Machines as well as prevailing market conditions. Hazelhurst applied a "conventional market sales approach" for the majority of Machines, which considered several factors: what is for sale by used equipment dealers, recent liquidations, historical sales results, catalogs, trade publications, internet listings, and comparative results of auctions. (*See* Exhibit M–108.) Hazelhurst concluded that the fifty Machines would have had a FMV of $4,130,000 and an OLV of $3,040,000 at the time of their rejection, if they had been properly maintained and repaired by Hayes. (Ex. M–108.) Excluding the nine Machines that were damaged pre-petition, the OLV for the remaining forty-one Machines is $2,050,000. (*Id.*)

Hayes disagrees with Hazelhurst's estimates and contends they are unreliable. Hayes asserts that Hazelhurst was retained to do only a general valuation study with limited research and documentation. (*See* Exs. D–224 & D–225.) Further, on cross examination, Hazelhurst admitted that this was his first retrospective appraisal and that he did not review or apply the USPAP standards for retrospective appraisals; namely, he did not set a cutoff date for comparable sales. Moreover, although Hazelhurst followed a market approach, he admitted that he used very limited comparable sales because machine tool sellers were reluctant to share information with competitors.[15] Hazelhurst also testified that he considered valuations by other Machinery Systems, Inc. ("MSI") employees and by Russell Maynard, a used machinery dealer. However, Hayes noted that those values varied widely from each other.

The Court concludes nonetheless that Hazelhurst's OLV calculation provides a legitimate opinion of what the GECC Machines should have been worth upon rejection by Hayes had they been properly maintained. Hazelhurst relied on his twenty years of experience in the CNC machine industry (and the market conditions at the time) to determine the value. This process, like any appraisal, is more art than science. While the Court recognizes that Hazelhurst's appraisal contained some minor flaws, on the whole the Court is convinced that Hazelhurst has provided the most realistic and appropriate measure of the Machines' value if they had been maintained properly. Therefore, the Court accepts Hazelhurst's appraisal and uses it as the starting point in calculating GECC's administrative expense.

### 3. Sales Proceeds

GECC, through the assistance of a third party, Meritage, Inc., and its subsidiary Meritage Remarketing (collectively, "Meritage"), inspected, recovered, and sold the Machines rejected by Hayes. Meritage was paid a sales commission based on the net sale proceeds of the Machines sold. (1/13/05 TR. at 4:21–24 (sealed).) GECC received $304,000 for the sale of the forty-one Machines at issue[16] approximately

15. Hazelhurst's reliance on the price at which equipment was offered for sale instead of actual sales figures might have inflated the value of the Machines, because of the possibility that equipment was sold for less than the asking price, given the depressed market at the time.

16. The Court does not consider the sale proceeds of the nine Machines that were dam-

15% of the value Hazelhurst said they should have had ($2,050,000). (Ex. M–55.) GECC contends that the Machines were sold in a commercially reasonable manner and that the low selling price reflects the market conditions and the significant damage caused by Hayes.

Cynthia Borgardt, who oversaw the sale process, testified at length about that process. Borgardt testified that Meritage (or an assigned third party) inspected the Machines, prepared inspection reports, and took digital photographs. Meritage then evaluated the information (as well as comparable pricing and other relevant information) and suggested an asking price. After receiving Meritage's recommendations and considering various factors, GECC determined the final asking and selling price. When Meritage received notification from GECC that a Machine was being returned, Borgardt listed the Machines on the internet (e.g., Meritage's web site, MachineTools.com, and GECC's website). It was also listed in trade publications such as Industrial Machine Tool Trader. Meritage marketed the Machines to end-users, brokers, dealers, machine rebuilders, and "anyone that might have a need for the equipment." (1/31/05 TR. at 49:14–17.) Also, current and potential customers (some of whom were listed in an internal database maintained by Meritage) were contacted by fax, e-mail, and cold call to advise them of the availability of the Machines.

Hayes asserts that the Machines were not sold in a commercially reasonable manner for several reasons. First, Hayes contends that the sale process was not designed to get the best price but was an effort simply to dispose of the Machines as quickly as possible. As evidence of this,

Hayes notes the lack of any documents reflecting the sales effort (for example, advertisements, marketing materials, quotes, and asking prices). Hayes contends that the lack of sales material evidences the lack of sales effort.

The Court rejects this argument. While the production of sales material would have supported GECC's position, it was not necessary. The Court finds Borgardt's detailed testimony about the sales effort credible and sufficient, because she was intimately involved with the process.

Hayes specifically questions the legitimacy of the price setting process because more than half the inspection reports (upon which the price was based) were not produced by GECC in discovery.[17] (1/31/05 TR. at 124:23–125:1.) Borgardt testified that the inspection reports were kept on a shared computer hard-drive. By the time of the discovery request, however, Meritage had vacated its offices and no longer had access to the shared drive. (*See* 1/13/05 TR. at 44.) Therefore, the Court concludes that the failure to produce those reports is not indicative of a defect in the sale process.

In general, the Court is convinced that the sale process conducted by Meritage for GECC was reasonable. As explained by Borgardt, Meritage conducted a thorough and well-designed sale and marketing campaign, not a quick and ill-conceived process as Hayes suggests. Although the sales brought low prices, this fact by itself does not mean the sales were not commercially reasonable. Several factors contributed to the low sale proceeds: the poor condition of the Machines, the severe drop in the machine tool market, and the purchase by used equipment dealers. Therefore, the Court concludes that, with respect to the

---

aged pre-petition, because no damages are due. *See* Part D *supra*.

17. No inspection reports were produced for Machines 3–12, 20–27, 36, 39–43, 47–49.

majority of the Machines that were in poor condition, the sale process was commercially reasonable and designed to achieve the highest price possible.

Hayes also contends that the sales were not conducted in a commercially reasonable manner because GECC did not repair any of the Machines before sale (not even a minor repair such as replacing a $1,000 transformer). (2/1/05 TR. at 46:13–41:1.) *See Liberty Nat'l Bank & Trust Co. v. Acme Tool,* 540 F.2d 1375, 1381 (10th Cir. 1976) (holding that sale was not commercially reasonable because seller did not follow industry norms by cleaning, painting, dismantling, and moving the oil rig in preparation for sale).

GECC responds that there is no evidence that repairing any of the Machines would have resulted in a higher sales price (net of the repair costs). In addition, GECC argues that, because of their deplorable condition, many of the Machines would have required a complete rebuild, which can be extremely costly. Further, Hazelhurst and Borgardt testified that the market for used equipment was very depressed at the time, further suggesting that repairing the Machines would not have been cost-effective. (1/13/05 TR. at 14:19–15:10, 70:18–20 (sealed).)

The Court concludes that Hayes's assertion that the lack of repairs by GECC made the sale of the Machines not commercially reasonable is misplaced. Under section XVIII(b) of the Master Lease "Lessee shall, and the Lessor may, solicit cash bids for the Equipment on an AS IS, WHERE IS BASIS . . . ." Thus, the Master Lease had no requirement that GECC repair the damaged Machines before sale, as asserted by Hayes. Instead, Hayes was the party obligated under the lease to

keep the Machines in good repair. (Ex. M–1 at § VII(a).) As found above, the Machines were not maintained or repaired by Hayes after the Petition Date. Thus Hayes cannot blame GECC for selling the Machines without first repairing them. Under the lease, GECC was free to do as it did, sell the Machines as they were, unrepaired.

Finally, Hayes asserts that the sale was not commercially reasonable because GECC sold the majority of the Machines to used machinery dealers,[18] which does not bring the best price. For example, Hazelhurst, on cross examination, admitted that the FMV and OLV values he calculated assumed a sale to end users (not used equipment dealers). Additionally, Hayes notes that the Master Lease itself specifically excludes used equipment dealers in the definition of FMV. (Ex. M–1 at § XIX(a).)

The Court rejects Hayes's arguments. The definition of FMV in the Master Lease is irrelevant to the issue at hand, because it simply sets the price at which Hayes may purchase the Machines at the expiration of the lease. (Ex. M–1 at § XIX(b).) It does not define what price GECC must obtain on default of the lease when it seeks to mitigate its damages by reselling the Machines.

Hayes did, however, present evidence that several Machines which were sold by GECC to used equipment dealers were later resold at much higher prices. Specifically, ACT bought Machines 38, 42, and 43 from GECC for $10,000 each and re-sold them for a total of $281,000. (FoF 195–98.) Hayes contends that the disparity in price proves that the sales by GECC were not commercially reasonable. *See, e.g.,*

---

18. Twenty-four of the forty-one Machines were sold to used equipment dealers. (*See*

Exhibit M–55.)

*United States v. Willis,* 593 F.2d 247, 259 (6th Cir.1979) ("the fact that the [prior private] offers were five times greater than the proceeds realized upon the [public] sale is at least probative on the question of commercial reasonableness."); *Liberty Nat'l Bank,* 540 F.2d at 1381 (fact that purchaser of oil rig for $42,000 resold it for $77,705.50 three months later supported finding that original sale was not commercially reasonable); *Mercantile Fin. Corp. v. Miller,* 292 F.Supp. 797, 801 (E.D.Pa.1968) (holding that plaintiff's sale of inventory for $19,000 which was resold for $57,000 "strongly suggested that the plaintiff did not obtain the fair market value for these goods at the time of the sale").

GECC argues, however, that the fact that the Machines were resold for higher amounts is not probative of the value of the Machines when GECC sold them because several factors caused the disparity. For example, GECC suggests that the Machines may have been repaired or improved after the sale to ACT. Further, the three Machines were part of a larger "bulk" sale by GECC: ACT purchased eighteen machines for a price of $213,000. Only seven of the eighteen machines had originally been leased by Hayes. (Ex. M–55 at GE 000189.) GECC posits that the differences in price may have been a result of the improper allocation of the original price among the eighteen machines. GECC presented no evidence, however, to explain how the $213,000 was allocated among the eighteen machines. Therefore, the Court will not speculate that the allocation was inappropriate.

Further, the evidence regarding repairs to the Machines resold by ACT is inconclusive. ACT's business records were produced to GECC, which could not identify any evidence that repairs were made to these Machines before their resale. (*See*

Ex. M–257) The Court concludes, therefore, that had GECC conducted the sale of these Machines in a commercially reasonable manner it would have received the same price that ACT did for the Machines.

In addition, evidence was presented that GECC sold Machines 14 and 15 to Rank International, Inc., for $9,000 each. (FoF 57.) Rank promptly resold them to Hayes for $18,000 each. (FoF 58.) The Machines did not even have to be moved.

GECC argues that it was duplicitous of Hayes to file a motion to reject those Machines, arguing to the Court that it no longer needed them, when it had already arranged to buy them back from Rank for a fraction of the rent due to GECC under the lease. (FoF 48.) The Court is not troubled by Hayes's actions because the Bankruptcy Code allows a debtor to do exactly what Hayes did: reject an onerous contract and replace it with one that reflects current market conditions. 11 U.S.C. § 365. The transaction is significant, however, because it does evidence that the market value of the Machines at that time was twice the amount GECC received. Thus, the Court concludes that in a commercially reasonable sale GECC would have received $18,000 each for Machines 14 and 15.

There was no evidence that any of the other Machines were resold at a profit. The Court finds it difficult to conclude, by extrapolating from these two incidents, that none of the sales were conducted in a commercially reasonable manner. The five Machines that were resold for significantly more than GECC received were in much better condition than many of the other Machines at issue here. Only eight other Machines (Machines 25, 30, 35, 39, 40, 41, 46, and 47) were in similarly good shape. The remainder of the Machines were inoperable or stripped of parts. (*See* Part I *supra.*) Therefore, the Court can-

not conclude that GECC's failure to sell the inoperable Machines to end users for more than it received was not commercially reasonable.

With respect to the Machines that were operable, however, the Court concludes that the sales were not commercially reasonable because the evidence established that Machines in similar condition were resold for significantly more than GECC received. *See, e.g., Willis,* 593 F.2d at 259 (questioning commercial reasonableness of public sale that realized one fifth of what private offers had been); *Liberty Nat'l Bank,* 540 F.2d at 1381 (concluding that sale of oil rig for 54% of resale value three months later was not commercially reasonable); *Miller,* 292 F.Supp. at 801 (holding that sale of inventory for one third what it later received provided strong evidence that it was not commercially reasonable).

It is reasonable, therefore, to conclude that GECC should have received more for Machines 25, 30, 35, 39, 40, 41, 46, and 47, which were in as good a condition as Machines that were resold for substantially more. Specifically, Machines 39, 40, and 41 were the same make, model and year as Machines 42 and 43, and there is no evidence that these Machines were not all in the same condition. ACT resold Machines 42 and 43 for an average price of $92,500. (FoF 197–98.) Therefore, the Court concludes that, in a commercially reasonable sale, GECC would have received the same amount for Machines 39, 40, and 41, rather than the $10,000 each it did receive.

Similarly, Machine 35 is the same make and model as Machine 38, although it is a year older. (Ex. M–108.) ACT resold Machine 38 for $96,000. (FoF 195.) Therefore, the Court concludes that in a commercially reasonable sale, GECC would have received the same price for Machine 35 rather than the $500 it did receive.

Machine 25 is the same make and model as Machines 23 and 24. (Ex. M–108.) The latter were sold for $5,000 each. (Ex. M–55.) Machines 23 and 24 were missing many parts. (FoF 106–08.) In contrast, there is no evidence that Machine 25 was missing any parts; and, in fact, it was in operating condition at the time of its return. (FoF 109–10.) Consequently, the Court concludes that in a commercially reasonable sale, GECC should have received more for Machine 25 than it did for Machines 23 and 24. Hayes presented no evidence what Machine 25 was worth, but GECC's expert testified that, if it had been maintained, it would have been worth $45,000. Because there is no indication that Machine 25 was not maintained in proper condition, the Court concludes that in a commercially reasonable sale GECC would have received for Machine 25 the OLV that GECC's expert opined it would be worth, namely $45,000.

Machine 30 was the same make and model as Machines 31 through 34. GECC received $2,000 for Machine 30 and only $500 each for the other Machines. Machine 30, however, was described as being in good condition, while the others were not. (*See* FoF 135–37, 143–51, 156, 161.) The Court concludes, therefore, that in a commercially reasonable sale Machine 30 would have received the OLV that GECC's expert opined it would be worth, namely $21,000.

Machines 46 and 47 were the same make and model as Machines 44, 45, and 48. Machines 44 and 45 had been cannibalized by Hayes and were sold by GECC for $1,000 each. (FoF 206, 213.) Machine 46, although operable, had been stored outside for three months; it sold for $2,500. (FoF 221.) The Court concludes that, given the lack of proper storage, the price received is reasonable. Machine 48 was not operable at the time it was returned to GECC;

nonetheless it was sold for $4,000. (FoF 237–38.) Machine 47 was operable but sold for the same amount. (FoF 227–30.) Consequently, the Court concludes that in a commercially reasonable sale, GECC should have received more for Machine 47 than it did for Machine 48. GECC's expert testified that, if it had been maintained, Machine 47 would have been worth $35,000. (See Ex. M–108.) Because there is no indication that Machine 47 was not maintained in good condition, the Court concludes that in a commercially reasonable sale GECC would have received $35,000 for Machine 47.

The Court, therefore, concludes that the proceeds received by GECC from the sale of the Machines must be increased to reflect the increased proceeds that would have been realized in a commercially reasonable sale. Attached as Exhibit A is a chart reflecting the Machines' OLV if they had been properly maintained, their actual sales prices, the price the Machines would have received in a commercially reasonable sale, and the damages sustained by them. The Court concludes that the total damages sustained by the GECC Machines which are entitled to administrative expense treatment is $1,204,500.

#### 4. Attorney's Fees

 The Master Lease (as amended) provides for attorney's fees as follows: "Lessee shall pay Lessor's reasonable attorney's fees incurred as a result of any default thereunder." (Ex. M–1 at § XII(c).)

GECC asserts that the Court should award attorney's fees under section 365(d)(10) because it is a current charge which arose at the time Hayes breached its maintenance and repair obligations. See, e.g., Muma, 279 B.R. at 489 (holding that "to the extent that reasonable attorney's fees are due from the sixtieth day of this case to the rejection of the . . . [l]eas-

es, they will be entitled to a section 365(d)(10) administrative claim"); In re Fleming Cos., 308 B.R. 689, 692 (Bankr. D.Del.2004) (enforcing debtors' obligation under section 365(d)(10) to purchase refrigeration equipment from lessor because the debtors had violated the lease by selling the building). GECC contends that the attorney's fees in Muma and the obligation to buy the refrigeration equipment in Fleming were secondary obligations triggered by the failure to perform primary obligations under the leases (i.e., to pay rent and not to sell the building). Thus, GECC concludes that Hayes's secondary obligation to pay attorney's fees in this case should be enforced under section 365(d)(10).

In the cases cited by GECC, however, the Court made no distinction between primary and secondary obligations. Rather, the question decided in each case was whether the obligation under the lease came due before or after rejection. In Fleming, the obligation to buy the equipment arose upon sale of the property. Because the debtors sold the property before rejection, the obligation was an administrative expense. 308 B.R. at 692. Similarly, in Muma, the Court determined that the attorney's fees that were incurred before rejection were entitled to administrative claim status. 279 B.R. at 489.

Hayes contends that GECC is not entitled to attorney's fees. As a preliminary matter, Hayes asserts that attorney's fees should be denied because GECC did not prove them at trial. See, e.g., Pride Hyundai, Inc. v. Chrysler Fin. Co., 355 F.Supp.2d 600, 605–06 (D.R.I.2005) ("Because the attorneys' fees in this case were in the nature of damages, [the defendant] had the burden of proving at trial that it was contractually entitled to those fees it sought in its counterclaim."). Indeed, GECC offered no evidence of what attor-

ney's fees were incurred or when they were incurred. Hayes further argues that, even if proven, attorney's fees would not be due under section 365(d)(10) because they only arose after rejection.

The Court agrees with Hayes. GECC has failed to prove at trial as an element of its damages what, if any, attorney's fees it incurred. *See, e.g., Pride Hyundai*, 355 F.Supp.2d at 604 (denying attorney's fees because party failed to prove entitlement to them at trial). While the Master Lease provides for attorney's fees and interest on default; the duty to pay only arises when the attorney's fees are incurred. In this case, they arose after the rejection date. Therefore, they are not allowable under section 365(d)(10). *See, e.g., Food City*, 95 B.R. at 456–57 (holding that fee due under lease for failure to operate premises as a grocery store only arose after lease was rejected and, therefore, was not an administrative expense under § 365(d)(3)).

### 5. *Interest*

■ GECC also asserts that it is entitled to pre- and post-judgment interest on its claim under the terms of the Master Lease which provides:

> Any rent or other amount not paid to Lessor when due hereunder shall bear interest, both before and after any judgment or termination hereof, at the lesser of eighteen percent (18%) per annum or the maximum rate allowed by law.

(Ex. M–1 at § XX(e).)

Hayes notes, however, that the Master Lease was amended to reduce the interest payable from 18% to a variable rate which, at the time of trial, was approximately 9.75%. The amendment provides:

> The first sentence of Section XX, paragraph (e), is hereby modified as follows: The words "eighteen percent (18%) per annum" are deleted and [replaced by] the words "four percent (4%) per annum

plus a variable per annum interest rate which shall be equal to the Prime Rate indicated in the 'Money Rates' column of the Wall Street Journal, Eastern Edition."

(Ex. M–1 at GE 000200.)

Hayes further argues that no interest is due to GECC because the obligation to pay interest did not arise before rejection of the leases and, therefore, is not payable as an administrative expense under section 365(d)(10). The Master Lease provides that interest is due on any amount that is unpaid. Hayes asserts that it was not obligated to pay any damages before rejection of the Schedules and, therefore, no interest is due.

The Court rejects this argument. To the extent the Court has found that damages are due as an administrative claim, GECC is entitled to interest thereon. Interest accrues under the Master Lease from the time of the breach. The Court is unable to determine the exact date of the breach, however, because Hayes's records do not show when the Machines became damaged. It is clear, though, that the breaches occurred before the Schedules were rejected. The Court will, therefore, award interest to GECC at the contract rate from the rejection date of each Machine.

## IV. CONCLUSION

For the reasons set forth above, the Court will grant GECC's application in part and allow it an administrative expense in the amount of $1,204,500 plus interest from the date of rejection of each Machine.

An appropriate order is attached.

### ORDER

**AND NOW** this day of **MARCH, 2006,** upon consideration of the applications of General Electric Capital Corporation

("GECC") for allowance and payment of an administrative expense and the response thereto filed by Hayes Lemmerz International, Inc., and after trial and briefing, for the reasons set forth in the accompanying Opinion, it is hereby

**ORDERED** that there shall be **ALLOWED** to GECC an administrative expense in the amount of $1,204,500 as reflected on Exhibit A attached hereto plus interest thereon from the date of the rejection.

*Exhibit A*

| Machine No. | Rejection Date | Post Petition Damage | OLV [1] | Sale Price [2] | CRS Price [3] | Damage [4] |
|---|---|---|---|---|---|---|
| 1 | 3/7/02 | None | 50,000 | 6,000 | 6,000 | NA |
| 2 | 2/14/02 | Failed to maintain Failed to repair | 35,000 | 6,000 | 6,000 | 29,000 |
| 3 | 1/15/02 | None | 110,000 | 4,000 | | NA |
| 4 | 1/15/02 | None | 110,000 | 4,000 | | NA |
| 5 | 1/15/02 | None | 110,000 | 4,000 | | NA |
| 6 | 1/15/02 | None | 110,000 | 4,000 | | NA |
| 7 | 1/15/02 | None | 110,000 | 4,000 | | NA |
| 8 | 1/15/02 | None | 110,000 | 4,000 | | NA |
| 9 | 1/15/02 | None | 110,000 | 4,000 | | NA |
| 10 | 1/15/02 | None | 110,000 | 4,000 | | NA |
| 11 | 1/15/02 | None | 110,000 | 4,000 | | NA |
| 12 | 4/3/02 | Failed to maintain Failed to repair Parts stripped Became inoperable | 65,000 | 17,000 | 17,000 | 48,000 |
| 13 | 4/3/02 | Failed to maintain Failed to repair Parts stripped Became inoperable | 30,000 | 500 | 500 | 29,500 |
| 14 | 5/12/03 | Failed to maintain Failed to repair | 65,000 | 9,000 | 18,000 | 47,000 |
| 15 | 5/12/03 | Failed to maintain Failed to repair | 65,000 | 9,000 | 18,000 | 47,000 |
| 16 | 2/28/03 | Failed to maintain Failed to repair | 40,000 | 10,500 | 10,500 | 29,500 |
| 17 | 3/24/03 | Failed to maintain Failed to repair Became inoperable | 90,000 | 12,500 | 12,500 | 77,500 |
| 18 | 3/24/03 | Failed to maintain Failed to repair | 90,000 | 12,500 | 12,500 | 77,500 |
| 19 | 3/24/03 | Failed to maintain Failed to repair | 90,000 | 12,500 | 12,500 | 77,500 |
| 20 | 7/19/02 | Stored outside Failed to maintain Failed to repair Parts stripped Became inoperable | 20,000 | 10,000 | 10,000 | 10,000 |
| 21 | 7/19/02 | Stored outside Failed to maintain | 20,000 | 10,000 | 10,000 | 10,000 |

| Machine No. | Rejection Date | Post Petition Damage | OLV [1] | Sale Price [2] | CRS Price [3] | Damage [4] |
|---|---|---|---|---|---|---|
| | | Failed to repair Parts stripped Became inoperable | | | | |
| 22 | 7/19/02 | Stored outside Failed to maintain Failed to repair Parts stripped Became inoperable | 20,000 | 10,000 | 10,000 | 10,000 |
| 23 | 7/19/02 | Stored outside Failed to maintain Failed to repair Parts stripped Became inoperable | 45,000 | 5,000 | 5,000 | 40,000 |
| 24 | 7/19/02 | Stored outside Failed to maintain Failed to repair Parts stripped Became inoperable | 45,000 | 5,000 | 5,000 | 40,000 |
| 25 | 7/19/02 | Failed to maintain | 45,000 | 5,000 | 45,000 | NA |
| 26 | 7/19/02 | Stored outside Failed to maintain Failed to repair Parts stripped Became inoperable | 45,000 | 5,000 | 5,000 | 40,000 |
| 27 | 7/19/02 | Stored outside Failed to maintain Failed to repair Parts stripped Became inoperable | 45,000 | 5,000 | 5,000 | 40,000 |
| 28 | 6/13/03 | Failed to maintain Failed to repair Parts stripped Operable as roughing only | 20,000 | 6,000 | 6,000 | 14,000 |
| 29 | 6/13/03 | Stored outside Failed to maintain Failed to repair Parts stripped Became inoperable | 45,000 | 3,500 | 3,500 | 41,500 |
| 30 | 2/14/02 | Failed to maintain | 21,000 | 2,000 | 21,000 | NA |
| 31 | 7/19/02 | Stored outside Failed to maintain Failed to repair Parts stripped Became inoperable | 21,000 | 500 | 500 | 20,500 |
| 32 | 7/19/02 | Stored outside Failed to maintain Failed to repair Parts stripped Became inoperable | 38,000 | 500 | 500 | 37,500 |
| 33 | 7/19/02 | Stored outside Failed to maintain Failed to repair Parts stripped Became inoperable | 38,000 | 500 | 500 | 37,500 |
| 34 | 7/19/02 | Failed to repair | 42,000 | 500 | 500 | 41,500 |

| Machine No. | Rejection Date | Post Petition Damage | OLV [1] | Sale Price [2] | CRS Price [3] | Damage [4] |
|---|---|---|---|---|---|---|
| | | Parts stripped Became inoperable | | | | |
| 35 | 7/19/02 | Failed to maintain | 75,000 | 18,000 | 96,000 | NA |
| 36 | 7/19/02 | Stored outside Failed to repair Parts stripped Became inoperable | 75,000 | 500 | 18,000 | 57,000 |
| 37 | 3/7/02 | Failed to maintain Failed to repair Parts stripped | 160,000 | 45,000 | 45,000 | 115,000 |
| 38 | 3/7/02 | Failed to maintain Parts stripped | 75,000 | 10,000 | 96,000 | NA |
| 39 | 3/7/02 | Failed to maintain | 60,000 | 10,000 | 92,500 | NA |
| 40 | 3/7/02 | Failed to maintain | 60,000 | 10,000 | 92,500 | NA |
| 41 | 3/7/02 | Failed to maintain | 60,000 | 10,000 | 92,500 | NA |
| 42 | 3/7/02 | Failed to maintain | 60,000 | 10,000 | 80,000 | NA |
| 43 | 3/7/02 | Failed to maintain | 60,000 | 10,000 | 105,000 | NA |
| 44 | 7/19/02 | Stored outside Failed to maintain Failed to repair Parts stripped Became inoperable | 60,000 | 1,000 | 1,000 | 59,000 |
| 45 | 7/19/02 | Stored outside Failed to maintain Failed to repair Parts stripped Became inoperable | 60,000 | 1,000 | 1,000 | 59,000 |
| 46 | 6/13/03 | Stored outside Failed to maintain | 25,000 | 2,500 | 2,500 | 22,500 |
| 47 | 3/7/02 | None | 35,000 | 4,000 | 35,000 | NA |
| 48 | 3/7/02 | Failed to maintain Failed to repair Became inoperable | 35,000 | 4,000 | 4,000 | 31,000 |
| 50 | 2/14/02 | Failed to maintain | 10,000 | 2,000 | 2,000 | 8,000 |
| 51 | 2/14/02 | Failed to maintain | 10,000 | 2,000 | 2,000 | 8,000 |
| | | **TOTAL DAMAGES: $1,204,500** | | | | |

1. The Orderly Liquidation Value that the Machine would have had on rejection if it had been properly maintained. (*See* Ex. M–108.)

2. The price received by GECC on sale of the Machine. (*See* Ex. M–55.)

3. The price that GECC should have received if it had sold the Machine in a commercially reasonable sale.

4. The amount of damages to which GECC is entitled as calculated by the difference between the Orderly Liquidation Value the Machine would have had if it had been properly maintained and the price GECC would have received in a commercially reasonable sale.

## FINDINGS OF FACT

### I. GROUP 1 MACHINES

#### A. Generally

1. After the Petition Date, performance at the various Hayes facilities was measured by the particular facility's ability to control cash flow rather than operational performance. (Ex. M–229 at 53:3–55:9.)

2. After the Petition Date, Hayes was put on "credit hold" or COD with many of its machine parts suppliers, including Okuma and Emco, making it very difficult for Hayes to obtain replacement parts. (Ex. M–228 at 19:1–22; M–229 at 54:10–21; M–231 at 35:23–36:23.)

3. There were certain parts for Okuma and Emco machines that could only be supplied by the manufacturers or their authorized dealers. (Ex. M–228 at 14:23–15:6.)

4. Hayes regularly took parts off machines that were not in production (including the GECC Machines) and used the parts to keep machines that were in production running. (Ex. M–228 at 18:11–19:22; Ex. M–231 at 33:1–11, 33:24–35:15.)

5. This practice was common throughout the industry. (Ex. D–326 at 77:17–23.)

6. Before the Petition Date, Hayes kept some records of what parts were being removed from what machines. (Ex. M–228 at 19:1–22.)

7. After the Petition Date, Hayes kept no records of what parts were taken from what machines. (Ex. M–228 at 19:1–22; M–231 at 33:24–35:22.)

#### B. Machines 1, 2, 12 at Gainesville, GA

#### Machine 1

8. Machine 1 was used by Hayes at its Gainesville, GA, facility. (Ex. M–256 at 16; Joint Pre–Trial Statement ("JPTS"), Machine List.)

9. On the Petition Date, Machine 1 was operable, although the slides needed repair. (Ex. M–256 at 22.)

10. Pre-petition, Machine 1 had been professionally de-installed and placed in storage. (Ex. D–318 at 48:17–21, 50:1–5, 18–23, 51:2–15, 52:20–25.) Prior to going into storage, it was used in production and had all of its parts. (Ex. D–318 at 50:1–5, 52:17–25.)

11. The Gainesville maintenance records do not indicate that Machine 1 was repaired or received preventive maintenance after the Petition Date, because it was in storage. (Ex. D–318 at 48:17–21, 50:1–5.)

12. The Schedule relating to Machine 1 was rejected on March 7, 2002. (JPTS ¶ 2 & Machine List.)

13. After the rejection, Machine 1 was professionally cleaned, retrieved from storage, and returned to the Gainesville facility to be picked up by GECC. (Ex. D–318 at 48:17–21, 50:1–13, 55:5–9.)

14. Machine 1 was inspected on March 21, 2002, at which time it could not be operated or tested because it was not connected to power, air or hydraulics. (Ex. M–98.) Therefore, the report does not show if the Machine was in operable condition on the date of inspection. (1/31/05 TR. at 87:19–23, 88:3–4.)

15. The inspection report does show that the way covers, doors, way wipers, sheet metal, and CRT on Machine 1 were in poor condition and needed work. (Ex. M–98.) At the time Machine 1 was returned to GECC, the slides needed to be repaired. (Ex. M–256 at 22, 26.)

16. There is no evidence that Machine 1 was damaged post-petition.

17. On May 13, 2002, GECC sold Machine 1 to R.A.B. Industries, Inc., for $6,000. (Ex. M–55 at GE 000178.)

### Machine 2

18. Machine 2 was used by Hayes at its Gainesville, GA, facility. (Ex. M–256 at 16; JPTS, Machine List.)

19. On the Petition Date, Machine 2 was operable, although the slides needed repair. (Ex. M–256 at 22.)

20. A machine that needs repairs to the slides cannot make parts to specifications. (1/31/2005 TR. at 146:4–20.)

21. There is no evidence that preventive maintenance was performed on Machine 2 after the Petition Date. (Ex. M–114.)

22. The Schedule relating to Machine 2 was rejected on February 14, 2002. (JPTS ¶ 2 & Machine List.)

23. Machine 2 was inspected on March 21, 2002, at which time it could not be operated or tested because it was not connected to power, air or hydraulics. (Ex. M–97.) Therefore, the report does not show if Machine 2 was in operable condition on the date of inspection. (1/31/05 TR. at 89:4–13.)

24. The inspection report does show that the way covers, way wipers, doors, electrical seal-tite, cables, duct work, and paint on Machine 2 were in poor condition; the slides still needed repair; and the Machine was in overall poor condition. (Ex. M–97; Ex. M–256 at 22, 26.)

25. On May 13, 2002, GECC sold Machine 2 to R.A.B. Industries, Inc., for $6,000. (Ex. M–55 at GE 000178.)

26. If Machine 2 had been properly maintained and in good repair, its Orderly Liquidation Value ("OLV") at the time its Schedule was rejected would have been $35,000. (Ex. M–108.)

### Machine 12

27. Machine 12 was used by Hayes at its Gainesville, GA, facility. (Ex. M–256 at 16; JPTS, Machine List.)

28. Before December 2000, Hayes performed weekly and monthly preventive maintenance on Machine 12. (Ex. D–93 at HLI 00477–86.)

29. Although its covers were damaged, Machine 12 was running in production on the Petition Date. (Ex. D–318 at 94:15–95:1, 97:1–10; 102:5–7; Ex. M–256 at 22.)

30. Preventive and other maintenance was performed on Machine 12 until December 2002. (Ex. M–245 at 95:16–96:25; Ex. D–93 at HLI 00477–89; Ex. D–174 at HLI 00866–96.)

31. After the Petition Date, Machine 12 was removed from production as excess capacity, but it was not disconnected or moved within the Gainesville facility. (Ex. D–318 at 97:11–98:21.)

32. The Schedule relating to Machine 12 was rejected on April 13, 2002. (JPTS ¶ 2 & Machine List.)

33. Between the Petition Date and the date Machine 12 was returned to GECC, it required a motor replacement, which was not done. (Ex. M–256 at 27.)

34. After rejection of Machine 12's Schedule and in preparation for pick-up by GECC, Hayes personnel disconnected the power, air, and water supply to Machine 12. (Ex. D–318 at 98:14–99:9.)

35. At the time it was returned to GECC, Machine 12 had many missing boards, required a motor replacement, and was not operable. (Ex. M–256 at 27; Ex. D–276.)

36. On September 24, 2002, GECC sold Machine 12 to J.M. Precision Products,

Inc., for $17,000. (Ex. M–55; Ex. M–74 at GE 000626.)

37. If Machine 12 had been properly maintained and in good repair, its OLV at the time its Schedule was rejected would have been $65,000. (Ex. M–108.)

### C. Machine 13 at Somerset, KY

38. Machine 13 was originally located in the Gainesville, GA, facility. In late 2000 or early 2001, without notice to GECC, Hayes moved Machine 13 to the Somerset, KY, facility. (1/14/2005 TR. at 43:15–22, 50:7–22; M–230 at 81:11–82:08.)

39. The Lease required Hayes to give GECC notice when Machines were moved from the location specified on the Schedule. (Ex. M–1 at GE 000193–200.)

40. Machine 13 was in operating condition when it left Gainesville. Machine 13 was never used at the Somerset facility. (Ex. M–245 at 110:9–14; 1/14/05 TR. at 44:11–12.)

41. After Machine 13 was moved to Somerset, Hayes stripped parts from the Machine to repair and maintain other machines Hayes owned. (1/14/2005 TR. at 44:13–21, 45:1–8, 51:23–52:14; M–230 at 83:7–25.)

42. At some point prior to the Petition Date, the servo amps, spindle amps, an axis motor, tool arms, and a table gearbox were removed from Machine 13. (1/14/05 TR. at 44:13–21; M–256 at 22.)

43. Machine 13 was stored near the foundry in the back of the Somerset facility. This area was very dusty and dirty. Machine 13 was not covered or lubricated to prevent it from rusting. (1/14/2005 TR. at 59:13–60:07.)

44. The Schedule relating to Machine 13 was rejected on April 3, 2002. (JPTS at ¶ 2 & Machine List.)

45. When Machine 13 was returned to GECC, it was not operable. (Ex. D–276.)

46. On December 13, 2002, GECC sold Machine 13 to American Commercial Trading, Inc. ("ACT"), a used machinery dealer, for $500. (Ex. M–55 at GE 000185; Ex. M–73 at GE 000618–19.)

47. If Machine 13 had been properly maintained and in good repair, its OLV at the time its Schedule was rejected would have been $30,000. (Ex. M–108.)

### D. Machines 14–19 at Gainesville, GA

#### Machines 14 & 15

48. Machines 14 and 15 were used by Hayes at its Gainesville, GA, facility. (Ex. M–256 at 16; JPTS, Machine List.)

49. Before the Petition Date, Hayes performed weekly, monthly, quarterly, and semi-annual preventive maintenance on Machines 14 and 15. (Ex. D–93 at HLI 00477–86; D–175 at HLI 00253–303; D–176 at HLI 00212–52.)

50. Machines 14 and 15 were running in production on the Petition Date. (Ex. D–318 at 117:11–14, 120:25–121:7; Ex. M–256 at 22.)

51. After the Petition Date, Hayes continued to perform monthly preventive maintenance on Machines 14 and 15 until June 2003. (Ex. D–93 at HLI 00486–95.)

52. After May 2002, Hayes's records evidence that it often failed to perform weekly preventive maintenance in a timely manner on Machines 14 and 15. (Ex. D–93 at HLI 00490–95.)

53. Machines 14 and 15 were inspected on September 4, 2002, at which time they were running in production and all functions were observed. (Ex. D–205 at GE 000151–52.)

54. On April 17, 2003, Hayes filed a motion to reject the Schedule relating to

Machines 14 and 15, asserting that the leases were "unnecessary to the Debtors' go-forward business operations." (Docket No. 2202 at ¶ 10.)

55. Prior to Hayes's rejection of the Schedule pertaining to Machines 14 and 15, Rank International called the Gainesville facility manager to learn what other machines Hayes would be rejecting so he could "get his bid in first as other people were calling about the same thing." (Ex. D–318 at 118:19–119:15.)

56. The Schedule relating to Machines 14 and 15 was rejected on May 12, 2003. (JPTS ¶ 2 & Machine List.)

57. On April 23, 2003, GECC sold Machines 14 and 15 to Rank International for $9,000 each. (Ex. M–55 at GE 000190; Ex. M–81 at GE 000673 & 000679.)

58. Hayes immediately arranged with Rank to buy Machines 14 and 15 for $18,000 each, saving Hayes the cost of disconnecting and removing the Machines from the Gainesville facility. (Ex. D–318 at 119:22–120:1, 120:7–121:12, 121:23–122:9, 123:11–19.)

59. A sale of a machine in place, where it does not have to be removed and reinstalled, will bring a higher price than one which has to be moved and reinstalled. (1/12/2005 TR. at 103:24–104:9.)

60. At least until May 2004, Hayes continually used Machines 14 and 15 in production. (Ex. D–318 at 120:22–121:12.)

61. If Machines 14 and 15 had been properly maintained, their OLV at the time the Schedule was rejected would have been $65,000 each. (Ex. M–108.)

### Machine 16

62. Machine 16 was used by Hayes at its Gainesville, GA, facility. (Ex. M–256 at 16; D–318 at 127:14–25.)

63. Machine 16 was running in production, with no parts missing, on the Petition Date. (Ex. D–318 at 128:6–8, 128:12–129:5; Ex. M–256 at 23.) Its chip auger, though present, was inoperable and its doors were damaged. (Ex. M–256 at 23; Ex. D–318 at 128:21–129:5.)

64. There is no evidence that preventive maintenance was performed on Machine 16 after the Petition Date. (Ex. M–114.)

65. The Schedule relating to Machine 16 was rejected on February 28, 2003. (JPTS ¶ 2 & Machine List.)

66. Machine 16 was inspected on September 4, 2002, at which time it was running in production and all functions were observed. (Ex. D–43.)

67. Sometime after the Schedule was rejected, Machine 16 was removed from production, disconnected from power, and moved to the back of the plant. (D–318 at 132:16–24.)

68. At the time of its return to GECC, the doors and the chip auger for Machine 16 still needed to be repaired. In addition, the slides needed to be rebuilt. (Ex. M–256 at 27.)

69. A machine that needs its slides rebuilt cannot make parts to specifications. (1/31/2005 TR. at 145:02–150:03; 1/31/2005 TR. at 139:22–141:21.)

70. Machine 16 was otherwise in operating condition on the Rejection Date and when it was returned to GECC. (Ex. D–318 at 132: 1–20; Ex. M–245 at 136:9–137:8; Ex. M–256 at 27.)

71. On March 31, 2003, GECC sold Machine 16 to Rank International for $10,500. (Ex. M–55 at GE 000191; Ex. M–82 at GE 000688.)

72. If Machine 16 had been properly maintained and in good repair, its OLV at the time its Schedule was rejected would have been $40,000. (Ex. M–108.)

## Machines 17–19

73. Machines 17–19 were used by Hayes at its Gainesville, GA, facility. (Ex. M–256 at 16.)

74. On the Petition Date, Machines 17–19 were running in production, with no parts missing. (Ex. M–241 at 79:19–22; Ex. D–318 at 149:18–23, 160:2–5, 16–18; Ex. M–245 at 141:5–11; Ex. M–256 at 23.)

75. There is no evidence that Hayes did daily, weekly, or quarterly preventive maintenance on Machines 17–19 after January 28, 2002. (Ex. M–114; Ex. M–245 at 142:15–21, 156:2–156:10, 157:4–10.)

76. Machines 17–19 were inspected on September 4, 2002, at which time they were running in production and all functions were observed. (Exs. D–45, D–47 & D–209.)

77. The Schedule relating to Machines 17–19 was rejected on March 24, 2003. (JPTS ¶ 2 & Machine List.)

78. Machines 17–19 were operational and used in production until the rejection. (Ex. D–318 at 143:8–10, 149:24–25, 160:19–22; Ex. M–241 at 79:13–80:23.)

79. Upon its return to GECC, Machine 17 needed a new transformer and covers. (Ex. M–256 at 23 & 27.)

80. The damaged transformer rendered Machine 17 inoperable. (Ex. M–245 at 146:2–8; Ex. M–256 at 27; D–276.)

81. The transformer could have been replaced for $1,000. (1/31/05 TR. at 123:23–124:13; 2/1/05 TR. at 46:13–47:1.)

82. Upon their return to GECC, the slides on Machines 18 and 19 needed to be rebuilt and the doors were damaged. (Ex. M–256 at 28.)

83. Even though a machine that needs its slides rebuilt can operate, it cannot produce parts within required tolerances. (1/31/05 TR. at 139:22–141:21, 145:2–150:03.)

84. On April 1, 2003, GECC sold Machines 17–19 to Rank International for $12,500 each. (Ex. M–55 at 1, GE 000192; Ex. M–83 at GE 000696.)

85. If Machines 17–19 had been properly maintained and in good repair, their OLV at the time the Schedule was rejected would have been $90,000 each. (Ex. M–108.)

### E. Machines 20–36 at La Mirada

86. Machines 20–36 were used by Hayes at its La Mirada, CA manufacturing facility. (Ex. M–256 at 16.)

87. Until sometime in 2001, Hayes had contracted with Ellison Machinery Company to do quarterly and semi-annual preventive maintenance in the La Mirada facility. (1/14/05 TR. at 90:7–91–13.)

88. Ellison was an integral part of the La Mirada preventive maintenance program. (1/14/05 TR. at 90:7–23; M–228 at 16:4–12.)

89. Maintenance in accordance with the program established by Ellison required daily, quarterly, and semi-annual maintenance in accordance with specific procedures. (1/14/05 TR. at 89:13–91:10.)

90. The daily maintenance required checking the machine's oil, lubrication, and coolant levels, and cleaning away the aluminum chips produced as waste during the machining process. Rough-cut lathes were cleaned two or three times each eight-hour shift; the drill and finish-cut lathes were cleaned once or twice each eight-hour shift. (1/14/05 TR. at 89:13–90:3.)

91. During the quarterly maintenance of Machines 35 and 36, for example, the guards were taken apart, the machine was cleaned, the belts and bearings were inspected, the lubrication oils were changed, repeatability was checked, and a ball-bar

test was performed by the Ellison engineer to determine if adjustments were required to produce a wheel to customer specification. (1/14/05 TR. at 90:4–23.)

92. The semi-annual maintenance typically lasted five to six days and involved checking the bearings, the bearing seals, the motors, and the plugs. (1/14/05 TR. at 90:24–91:10.)

93. Ellison's technicians trained five or six La Mirada employees to perform the preventive maintenance. (1/14/05 TR. at 91:11–21.)

94. As a cost-cutting measure, Hayes ceased using Ellison to do preventive maintenance at the same time Hayes had major layoffs at the La Mirada facility. (Ex. M–229 at 17:16–18:7.)

95. After the arrangement with Ellison was terminated by Hayes, preventive maintenance was done on a much lower level by La Mirada personnel. (Ex. M–228 at 16:4–17:8, 17:16–18:7.)

96. On or about March 24, 2002, Hayes ceased keeping any maintenance records with respect to its equipment, although the La Mirada plant continued to operate. (Ex. D–294; 1/14/05 TR. at 135:3–135:23.)

97. At that same time, Hayes laid off the La Mirada preventive maintenance personnel and terminated the preventive maintenance program that Hayes had instituted after its relationship with Ellison ceased. (Ex. M–228 at 39:23–40:10.)

98. After June 2002, the preventive maintenance program was stopped. (M–228 at 39:23–40:10.)

99. Post-petition, Hayes employees at the La Mirada facility knew which machines were owned by Hayes and which machines were leased from GECC. Hayes's employees knowingly and intentionally stripped parts from the leased GECC Machines and used the parts to keep machines owned by Hayes running in production. (Ex. M–228 at 18:11–19:22; Ex. M–231 at 33:1–11, 33:24–34:7; Ex. D–136; 1/14/05 TR. at 136:15–21, 138:19–139:23.)

**Machines 20–27**

100. On the Petition Date, Machines 20–27 were in operating condition. (1/14/05 TR. at 97:7–25, 100:23–101:3, 103:5–12, 105:21–106:5, 108:6–11, 110:7–13, 112:12–20, 114:19–115:3; Ex. D–294A at HLI 006785; D–136.)

101. There is no evidence that repairs were performed on Machines 20–26 after January 14, February 25, March 7, January 2, March 23, March 13, March 18, 2002, respectively, or that preventive maintenance was performed on Machines 20–25 after the Petition Date or on Machine 26 after March 11, 2002. (Exs. D–136 & D–294.)

102. Machines 23–27 were operating on January 2, March 23, March 13, March 18, February 15, 2002, respectively. (1/14/05 TR. at 106:6–24, 108:12–109:3, 110:20–111:8, 112:11–113:16, 114:21–115:20; Ex. D–294A at HLI 005770, HLI 007125, HLI 007029, HLI 007073, HLI 006655.)

103. In early 2002, Machines 20–24 and 26–27 were removed from production, disconnected, cleaned, moved outside by a professional rigger, and tarped. (1/14/05 TR. at 98:7–100:2, 101:11–102:14, 104:16–105:2, 106:10–107:12, 108:15–109:17, 112:6–114:3, 114:21–116:8.)

104. The Schedule relating to Machines 20–27 was rejected on July 19, 2002. (JPTS ¶ 2 & Machine List.)

105. Hayes admits that, upon its removal from the La Mirada facility, Machine 20 was missing an input shaft for the headstock and some guards. (1/14/05 TR. at 98:7–100:9.)

106. When Machine 23 was returned to GECC, it was missing a spindle drive.

(1/14/05 TR. at 106:10–107:19.) The cost of replacing that part is $3,780. (Ex. D–251 at 17, item 16a.)

107. When Machines 21, 22, 24, 26, and 27 were returned to GECC, they were missing unspecified parts. (1/14/05 TR. at 102:15–21, 105:3–12, 109:18–23, 114:4–9, 116:9–14; Ex. M–256 at 28–29.)

108. Hayes admits that Machines 20–24, 26, and 27 were not operable at the time they were returned to GECC. (Ex. D–276.)

109. Machine 25 was in operating condition when it was returned to GECC. (1/14/05 TR. at 110:20–111:16.)

110. Machine 25 was never irreparably damaged, rendered permanently unfit for use, or worn out post-petition, because it was in operating condition on the Rejection Date and upon its removal from the La Mirada facility. (1/31/05 TR. at 86:3–12; Ex. D–251 at 4 & 19.)

111. On August 15, 2002, GECC sold Machines 20–22 to Blue Star Machinery for $10,000 each. (Ex. M–55; M–61 at GE 000545.)

112. If Machines 20–22 had been properly maintained and in good repair, their OLV at the time the Schedule was rejected would have been $20,000 each. (Ex. M–108.)

113. On September 24, 2002, GECC sold Machines 23–27 to ACT for $5,000 each. (Ex. M–55; Ex. M–62 at GE 000552.)

114. If Machines 23–24 and 26–27 had been properly maintained and in good repair, their OLV at the time the Schedule was rejected would have been $45,000 each. (Ex. M–108.)

### Machines 28 & 29

115. On the Petition Date, Machines 28 and 29 were operating. (1/14/05 TR. at 116:25–117:10, 119:9–11.)

116. The base term of the Schedule relating to Machines 28 and 29 expired on February 14, 2003, but the Schedule was not rejected until June 13, 2003. (JPTS ¶ 2 & Machine List.)

117. At the conclusion of the lease, Hayes did not return Machines 28 and 29 but instead continued to use them. (1/14/05 TR. at 117:2–118:21, 119:7–25; Ex. D–294A at HLI 007098.)

118. After March 7, 2002, Machine 29 was removed from production, disconnected, cleaned, moved outside by a professional rigger, and tarped. (1/14/05 TR. at 119:12–25, 120:6–12; Ex. D–294A at HLI 006951.)

119. Machines 28 and 29 were inspected in July 2003. (Ex. M–100.)

120. At the time of inspection, neither Machine was operating. (Ex. M–232 at 42:12–20, 51:18–25.)

121. At the time of the inspection, Machine 28 was in the following condition: (a) very dirty, rusty surfaces, and missing a drive board; (b) pitted upper-turret X-axis; (c) damaged operator's panel, which was integral to the computer control of the Machine; (d) loose wires, "jumper" wires, and dirty electrical cabinets; (e) dirty and rusty chip conveyor/coolant tank; and (f) missing ASI chuck, an accessory to the Machine and the most valuable part. (Ex. M–100; Ex. M–232 at 51:17–25, 52:13–53:04, 53:13–55:21.)

122. Absent a complete re-manufacturing, Machine 28 could be restored as a roughing machine only. (Exs. M–100 & M–265.)

123. A roughing machine is a machine that is suitable for removing the bulk of the metal when making a part but, because of its lack of precision, is incapable of performing a finishing or polishing cut. (Ex. M–232 at 59:22–60:20.)

124. At the time Machine 28 was leased to Hayes, it was capable of performing a finishing or polishing cut, as well as a roughing cut. (1/31/05 TR. at 169:9–170:1.)

125. At the time of the inspection, Machine 29 was in the following condition: (a) very rusty inside and outside; (b) rusted ways and pitted ball screw; (c) missing guards; (d) major rust on the doors; (e) loose cables on the VAC spindle drive indicating it was replaced with a defective unit; and (f) rusted headstock pulley. (Ex. M–100; Ex. M–232 at 67:10–68:21, 70:7–13, 70:20–71:07, 71:19–72:4, 74:1–6, 75:15–76:25, 77:24–78:13.)

126. Machine 29 was not repairable because of its condition and because it would not be economically feasible to rebuild it. (Ex. M–232 at 116:4–117:9.)

127. The only value Machine 29 had was for parts. Because Machine 29 had already been used as a "parts" machine by Hayes, however, that value was greatly diminished. (Ex. M–232 at 116:4–117:9.)

128. A "parts" machine is a machine that is not used in production, but is used instead as a source of replacement parts for other machines. (Ex. M–232 at 113:25–116:10.)

129. On November 18, 2003, GECC sold Machines 28 and 29 to Machinery Systems, Inc., for $6,000 and $3,500, respectively. (Ex. M–55; Ex. M–65 at GE 000568 & 000572.)

130. If Machines 28 and 29 had been properly maintained and in good repair, their OLV at the time the Schedule was rejected would have been $20,000 and $45,000 respectively. (Ex. M–108.)

**Machine 30**

131. On the Petition Date, Machine 30 was in operating condition. (1/14/05 TR. at 120:19–121:13.)

132. The Schedule relating to Machine 30 was rejected on February 14, 2002. (JPTS ¶ 2 & Machine List.)

133. There is no evidence that preventive maintenance was performed on Machine 30 after March 24, 2002. (Ex. D–294.)

134. Machine 30 was still in production on March 24, 2002, more than five weeks after it was rejected. (1/14/05 TR. at 122:14–16.)

135. Machine 30 was inspected on May 7, 2002, at which time it was in okay condition and running in production. (Ex. D–219.)

136. At the time Machine 30 was returned to GECC, it was in operating condition. (1/14/05 TR. at 122:17–123:3.)

137. On July 30, 2002, GECC sold Machine 30 to J.R. Engineering for $2,000. (Ex. M–55; Ex. M–67 at GE 000584–587.)

**Machines 31–33**

138. Machines 31–33 were operating on the Petition Date. (1/14/05 TR. at 123:14–15, 125:8–14, 127:14–22.)

139. There is no evidence that repairs were performed on Machines 31–33 after March 24, February 5, or March 12, 2002, respectively, or that preventive maintenance was performed after January 21, 2002, February 20, 2002, or the Petition Date, respectively. (Ex. D–294.)

140. The Schedule relating to Machines 31–33 was rejected on July 19, 2002. (JPTS ¶ 2 & Machine List.)

141. At some time in 2002, Machines 31–33 were removed from production, disconnected, cleaned, moved outside by a professional rigger, and tarped. (1/14/05 TR. at 124:1–16, 126:15–22, 128:10–21.)

142. Machines 31–33 were inspected on February 24, 2003. (Exs. M–38, M–41 & M–92.)

143. The inspection report for Machine 31 indicates its condition was as follows: damaged doors and covers, non-functional controller, and missing spindle unit and tool changer. (M–38.)

144. The inspection report for Machine 32 indicates that it was missing many parts (Z-axis covers, the X,Y and Z Fanuc motor drives, the Fanuc spindle drive, a spindle unit, the B-axis motor, and a tool changer) and that the controller was not functioning. (Ex. M–41.)

145. The inspection report for Machine 33 shows its condition was as follows: (a) missing spindle motor, spindle assembly, tool changer, Y-axis motor, X, Y, and Z Fanuc motor drives, spindle drive, and some manuals; (b) poor way covers, doors, way wipers, X-axis and Z-axis box ways and paint; (c) damaged doors and covers; (d) non-functional controller; and (e) turkite and rust problems. (Ex. M–92; Ex. M–256 at 30.)

146. Repairing turkite problems is a very "heavy" job and is almost like re-building part of the machine. (1/14/05 TR. at 122:1–4.)

147. At the time Machine 31 was returned to GECC: (a) it was missing a table and spindle, and had wear and tear on the axis; (b) the way covers, doors, way wipers, and paint were all in poor condition; (c) the Fanuc 21M Controller was not functional; (d) it was missing some manuals and a tool changer; and (e) the X-axis and Z-axis box ways were in poor condition. (Ex. M–256 at 29; 1/14/05 TR. at 124:20–23; Ex. M–38.)

148. When Machine 32 was returned to GECC, it was missing a spindle, a table, a motor drive, a spindle drive, a motor, a tool changer, and some covers, and its controller did not function. (1/14/05 TR. at 127:1–6; Ex. M–41.)

149. When Machine 33 was returned to GECC, it had rust on the ways, turkite problems, and was missing some guards which protect the ball screw. (1/14/05 TR. at 128:25–129:3; Ex. M–256.)

150. The Machines cannot perform their functions without a spindle, spindle drive, axis drives, and table, which are major components. (1/14/05 TR. at 152:15–153:13.)

151. As a result, in the condition in which Machines 31–33 were returned to GECC, they were not operable. (Ex. D–276; 1/14/05 TR. at 152:15–153:13.)

152. On March 7, 2003, GECC sold Machines 31–33 each to J.R. Engineering for $500. (Ex. M–55; Ex. M–68 at GE 000592.)

153. If Machine 31 had been properly maintained and in good repair, its OLV at the time the Schedule was rejected would have been $21,000. (Ex. M–108.)

154. If Machines 32 and 33 had been properly maintained and in good repair, their OLV at the time the Schedule was rejected would have been $38,000 each. (Ex. M–108.)

### Machines 34 & 36

155. As of the Petition Date, Machines 34 and 36 were out of production and not operational. (1/14/05 TR. at 129:17–25, 132:13–24; Ex. M–256 at 24.)

156. As of the Petition Date, Machine 34 was missing its table, spindle, drives, and guards; Machine 36 was missing a turret, ball screws, spindle drives, motors, and guards. (1/14/05 TR. at 129:12–130:11, 132:1–133:6; Ex. M–256 at 24.)

157. There is no evidence that preventive maintenance or repairs were performed on Machines 34 or 36 after the Petition Date. (Ex. D–294.)

158. Some time after the Petition Date, Hayes disconnected Machine 36 and

moved it outside at the La Mirada facility, but took no steps to protect the Machine from the elements or from rusting. (1/14/05 TR. at 132:25–133:11, 141:3–12.)

159. On July 19, 2002, the Schedule relating to Machines 34 and 36 was rejected. (JPTS ¶ 2 & Machine List.)

160. After the Petition Date, Hayes removed additional parts, including guards, from Machines 34 and 36. (1/14/05 TR. at 130:4–11, 132:1–133:6; Ex. M–256 at 30.)

161. At the time Machine 34 was returned to GECC, it was missing its table, spindle, drives, and guards. (1/14/05 TR. at 130:4–11; Ex. M–256 at 24 & 30.)

162. At the time it was returned to GECC, Machine 36 was missing a turret, ball screws, spindle drives, axis drives, motors, guards, and other parts. (Ex. M–256 at 24 & 30; 1/14/05 TR. at 133:2–6.)

163. At the time of their return, Machines 34 and 36 were inoperable. (Ex. D–276; 1/14/05 TR. at 152:15–153:13; 1/31/05 TR. at 108:16–109:7.)

164. On December 12, 2002, GECC sold Machines 34 and 36 to ACT for $500 each. (Ex. M–76 at GE 000642.)

165. If Machines 34 and 36 had been properly maintained and in good repair, their OLV at the time the Schedule was rejected would have been $42,000 and $75,000 respectively. (Ex. M–108.)

**Machine 35**

166. On the Petition Date, Machine 35 was operating. (1/14/05 TR. at 130:23–131:4.)

167. Machine 35 was operating on March 23, 2002. (1/14/05 TR. at 131:6–17; Ex. D–294A at HLI 007125.)

168. There is no evidence that repairs were performed on Machine 35 after March 23, 2002, or that preventive maintenance was performed after February 6, 2002. (Ex. D–294.)

169. The Schedule relating to Machine 35 was rejected on July 19, 2002. (JPTS ¶ 2 & Machine List.)

170. Machine 35 was inspected on August 23, 2002. The inspection report indicates that the Machine was under power during the inspection and shows nothing suggesting that the Machine was not operable. (1/31/05 TR. at 98:8–99:6; Ex. D–156.)

171. Upon its return to GECC, Machine 35 was in operating condition. (1/14/05 TR. at 131:18–25.)

172. On September 23, 2002, GECC sold Machine 35 to ACT for $18,000. (Ex. M–75 at GE 000637.)

**F. Machines 37–43 at Somerset, KY**

173. Pre-petition, Hayes had an extensive preventive maintenance program at the Somerset facility which had been established by the service representative of the CNC machine manufacturers. (1/14/05 TR. at 26:21–29:9.)

174. Under that program, each machining cell was shut down four times a year for three days to perform maintenance. (1/14/05 TR. at 27:16–21.)

175. Quarterly preventive maintenance at the Somerset facility involved cleaning chips from the ball screw and spindle areas; checking the bearings, ball screws, and motors for vibration; checking the belts and way lube; and changing the hydraulic oil, lube, and filters. (1/14/05 TR. at 28:4–14.)

176. Daily preventive maintenance was also performed on the machines at the Somerset facility at which time they were shut down every two hours for a thorough cleaning and visual inspection. (1/14/05 TR. at 28:18–29:2.)

177. After the Petition Date, no preventive maintenance was performed at Somerset; maintenance was performed only if a machine broke down. (M–230 at 123:17–22, 133:1–5, 139:3–8; Ex. M–256 at 20–21.)

178. After Hayes ceased doing preventive maintenance at the Somerset facility, the only cleaning of the GECC Machines was a superficial surface cleaning done by the daily operators. None of the Machine covers were removed to clear the chips from the inside, where the ball screws and other components are located. (Ex. M–230 at 115:25–116:22, 117:1–4.)

179. In June 2001, production began to drop at the Somerset facility. (Ex. M–230 at 48:3–24.)

180. From June 2001 until the plant closed in March 2002, Somerset had several dramatic layoffs of plant personnel, and the number of maintenance workers dropped from 35 to 6 or 7. (Ex. M–230 at 48:3–24.)

181. After Somerset ceased operations, Hayes invited representatives from its other facilities to Somerset to identify machines, parts, inventory, and other equipment that they could use in their respective facilities. The plant manager described it as a "shopping spree of anything in the plant that they wanted." (1/14/05 TR. at 70:9–71:3, 74:12–75:4; M–245 at 110:9–111:8.)

182. Personnel from the other facilities "tagged" all the GECC Machines at Somerset for parts. (1/14/05 TR. at 74:12–75:4.)

183. Hayes kept no records of what parts or equipment were shipped to its other facilities after the "shopping spree." (1/14/05 TR. at 62:10–63:6, 71:4–23.)

184. Machines 37–43 were used by Hayes at the Somerset, KY facility. (Ex. M–256 at 16; JPTS, Machine List.)

185. On the Petition Date, Machines 37–43 were in production and not missing any parts or requiring any repair. (1/14/05 TR. at 35:18–22, 38:14–39:8, 40:24–42:4.)

186. After the Petition Date, Hayes serviced and repaired Machines 37–43 but did not perform any preventive maintenance on them. (Ex. M–256 at 20.)

187. By February 15, 2002, the last day of production at the Somerset facility, Machines 37–43 had been taken out of production. (1/14/05 TR. at 35:23–36:7, 39:9–13, 42:5–8.)

188. After Machines 37–43 were taken out of production, they were thoroughly cleaned and the power was shut off. (1/14/05 TR. at 36:8–15, 39:17–23, 42:19–20.)

189. The Schedule relating to Machines 37–43 was rejected on March 7, 2002. (JPTS ¶ 2 & Machine List.)

190. Machines 37 and 38 were inspected on March 15, 2002, at which time the Machines were generally in good condition, except that Machine 37 was missing three (of forty) pockets from the tool changer and Machine 38 had some dents on the way covers. (Exs. D–213 & D–215.)

191. A machine can operate with dented way covers and without pockets, which are replaceable parts. (1/31/05 TR. at 100:5–12, 102:3–103:6; Ex. D–316 at 98:6–99:6.)

192. No inspection reports for Machines 39–43 were produced.

193. On April 17, 2002, GECC sold Machine 37 to ACT for $45,000. (Ex. M–55; Ex. M–80 at GE 000669.)

194. If Machine 37 had been properly maintained and in good repair, its OLV at the time the Schedule was rejected would have been $160,000. (Ex. M–108.)

195. On April 17, 2002, GECC sold Machine 38 to ACT for $10,000. (Ex. M–55 at GE 000189; Ex. M–80 at GE 000669.) Three weeks later, ACT sold Machine 38, F.O.B. Somerset, KY, to Prime Wheel, Inc., for $96,000. (Ex. D–308 at ACT/Coleman 000003.)

196. On April 17, 2002, Machines 39–43 were sold by GECC to ACT for $10,000 each. (Ex. M–55; Ex. M–80 at GE 000669.)

197. On January 31, 2003, ACT re-sold Machine No. 42 to Ultra Wheel, Inc., for $80,000. (Ex. D–308 at ACT/Coleman 00006.)

198. On September 16, 2002, ACT resold Machine No. 43 to Ultra Wheel, Inc., for $105,000. (Ex. D–308 at ACT/Coleman 00004.)

199. There is insufficient evidence to determine if ACT performed any repairs on Machines 38, 42 or 43 prior to their resale. While the business records of ACT were produced and show charges for repairs, transportation, storage, and parts for machines, the machine on which the work was performed is not always indicated on the invoices. (Ex. D–308; Ex. M–257.)

### G. Machines 44 & 45 at Sedalia, MO

200. In May 2000 Machines 44 and 45 were moved by a professional rigger from Hayes's Huntington, IN, facility to the Sedalia, MO, facility because the latter required more equipment. (1/31/05 TR. at 9:20–11:6, 13:4–8; Ex. D–311.)

201. When Machines 44 and 45 were brought into the Sedalia plant, they were set up off-line and connected to power and air, and a capacity study was performed on each Machine. Those studies demonstrated that both Machines were able to produce parts within tolerances. (1/31/05 TR. at 11:23–12:13.)

202. After the capability studies were performed, however, Machines 44 and 45 were never used in production because the increased volume did not materialize. (1/31/05 TR. at 11:17–12:13.)

203. When Hayes needed replacement parts to keep the machines it owned running in production, Hayes took parts from whatever machines were available, including Machines 44 and 45. (1/31/05 TR. at 24:3–22.)

204. On or around the Petition Date, when Hayes began doing poorly financially, the amount of money available at Sedalia for preventive maintenance and repairs on machines was reduced substantially, and there were not sufficient funds to perform the maintenance required. (1/31/05 TR. at 23:17–23.)

205. The maintenance dollars that were available were used first for emergency repairs to keep machines in production. (1/31/05 TR. at 23:24–24:2.)

206. After the Petition Date and before they were returned to GECC, Machines 44 and 45 were cannibalized by Hayes, making them inoperable. (1/31/05 TR. at 24:3–16, 25:22–26:12; Exs. M–46 & M–47; D–276.)

207. Hayes did not keep any records of what parts were removed from Machines 44 and 45. (1/31/05 TR. at 24:17–22.)

208. After Machines 44 and 45 were stripped of parts, Hayes put the Machines outside covered with a tarp, but took no other steps to protect them. (1/31/05 TR. at 14:22–15:3, 24:23–25:21.)

209. The Schedule relating to Machines 44 and 45 was rejected on July 19, 2002. (JPTS ¶ 2 & Machine List.)

210. Machines 44 and 45 were outside approximately one month before they were removed from the facility by GECC or its

designee. (1/31/05 TR. at 12:14–21, 15:7–12.)

211. Machines 44 and 45 were inspected on February 3, 2003. (Exs. M–46 & M–47.) The inspection reports (and attached photographs) show that Machines 44 and 45 were missing their CRT monitors and MDI panels, and that Machine 45 was also missing a controller and blower motor. (*Id.*)

212. Machines 44 and 45 could not be operated without the missing parts and needed to be completely rebuilt. (1/31/05 TR. at 25:22–26:12; D–276.)

213. On March 7, 2003, GECC sold Machines 44 and 45 to J.R. Engineering, Inc., for $1,000 each. (Ex. M–55; Ex. M–68 at GE 000595.)

214. If Machines 44 and 45 had been properly maintained and in good repair, their OLV at the time the Schedule was rejected would have been $60,000 each. (Ex. M–108.)

### H. Machines 46 & 47 at Huntington, IN

215. Machines 46 and 47 were used by Hayes at the Huntington, IN. facility. (Ex. M–256 at 16; JPTS, Machine List.)

### Machine 46

216. On October 15, 2002, the base term of the Schedule relating to Machine 46 expired, but the Schedule was not rejected until June 13, 2003. (JPTS ¶ 2 & Machine List.)

217. When Machine 46 reached the end of its basic term, Hayes was obligated to comply with all of the return provisions of the Master Lease and the Schedule. (Ex. M–1 at § XI; Ex. M–20 at GE 000336–37.)

218. Hayes did not comply with any of the return provisions of the Master Lease or Schedule with respect to Machine 46.

219. Through November 15, 2002, Machine 46 continued to operate and received preventive maintenance and repairs. (Ex. M–236 at 66:10–22; Ex. D–325 at 93:9–94:3; 102:7–13.)

220. After November 15, 2002, no preventive maintenance or repairs were performed on Machine 46. (Ex. D–189 at HLI 00171–84; Ex. M–236 at 70:5–22, 77:6–79:10, 80:1–80:24.)

221. On January 28, 2003, Machine 46 was inspected, at which time the chip conveyor and hydraulic unit had been stored outside, uncovered, for three months. (Ex. M–35; Ex. M–238 at 17:20–18:7.)

222. Storage of the hydraulic unit and chip conveyor outside is not consistent with the manufacturer's recommendations for the Machine. (1/31/05 TR. at 172:18–174:10.)

223. On January 31, 2003, GECC sold Machine 46 to J.R. Engineering for $2,500. (Ex. M–55 at GE 000188; Ex. M–79.)

224. If Machine 46 had been properly maintained and in good repair, its OLV at the time the Schedule was rejected would have been $25,000. (Ex. M–108.)

### Machine 47

225. On the Petition Date, Machine 47 was operable and running in production. (Ex. D–325 at 97:20–23, 98:10–14; Ex. M–256 at 25.)

226. The Schedule relating to Machine 47 was rejected on March 7, 2002. (JPTS ¶ 2 & Machine List.)

227. On the rejection date, Machine 47 was operable and running in production. (Ex. D–325 at 97:24–98:21.)

228. On May 22, 2002, GECC sold Machine 47 to J.R. Engineering for $4,000. (Ex. M–55 at GE 000179; Ex. M–64 at GE 000563.)

229. Hayes leased Machine 47 from J.R. Engineering and continued to use it in

production through September 6, 2002. (Ex. D–325 at 99:19–100:12.)

230. Machine 47 did not become irreparably damaged, permanently rendered unfit for use, or worn out, because it was in operating condition on the Petition Date and at every time thereafter until its sale by GECC. (Ex. D–325 at 99:19–100:12; 1/31/05 TR. at 86:3–12; Ex. D–276.)

### I. Machine 48 at Somerset, KY

231. Machine 48 was originally located at the Huntington, IN, facility, but in late 2000 was moved by Hayes to the Somerset facility. (1/14/05 TR. at 45:21–46:9.)

232. Machine 48 was not used in a production cell at the Somerset facility. Instead, it was used as a stand-alone machine to perform the flange cut on the wheel. (1/14/05 TR. at 45:16–46:18.)

233. As of the Petition Date, no parts had been removed from Machine 48, and the Machine was capable of making the flange cut. (1/14/05 TR. at 46:19–47:1.)

234. After the Petition Date, Machine 48 was not used at the Somerset facility. (1/14/05 TR. at 47:2–4.)

235. After the Somerset facility ceased production, Machine 48 was cleaned and the power to the Machine was shut off. (1/14/05 TR. at 47:5–16.)

236. The Schedule relating to Machine 48 was rejected on March 7, 2002. (JPTS at ¶ 2 & Machine List.)

237. Machine 48 was not operable when it was returned to GECC. (1/14/05 TR. at 66:17–19, Ex. M–256 at 20–21, Ex. D–276.)

238. On May 23, 2002, GECC sold Machine 48 to J.R. Engineering for $4,000. (Ex. M–55; Ex. M–64 at GE 000563.)

239. If Machine 48 had been properly maintained and in good repair, its OLV at the time the Schedule was rejected would have been $35,000. (Ex. M–108.)

### J. Machines 50 & 51 at Howell, MI

240. Machines 50 and 51 were used at the Howell, MI, facility between late 1995 and early 1998. (1/31/05 TR. at 36:3–37:24; Ex. M–256 at 16.)

241. During that two-year period, Machines 50 and 51 were given regular preventive maintenance, they performed properly, and they made validated parts. Hayes improved each Machine by adding a fourth axis turntable at a total cost of $45,000. (1/31/05 TR. at 38:21–39:16.)

242. Hayes stopped using Machines 50 and 51 when it decided to automate the machine cells at the Howell facility. (1/31/05 TR. at 38:10–20.)

243. In approximately September 2001, Machines 50 and 51 were moved by a professional rigger from the Howell facility to a dry, heated warehouse located 20 miles from the facility. (1/31/05 TR. at 40:9–10, 22–25, 41:1–8, 23–25, 42:7–10.)

244. Hayes did not notify GECC of the move or get its consent. (1/31/05 TR. at 44:6–45:7.)

245. Hayes did not apply cosmoline or any other similar substance to the bare metal parts on the Machines to prevent rusting during storage. (1/31/05 TR. at 45:18–21.)

246. The Schedule relating to Machines 50 and 51 was rejected on February 14, 2002. (JPTS at ¶ 2 & Machine List.)

247. On May 1, 2002, Machines 50 and 51 were inspected, but the inspector was unable to power-up and test the various systems on the Machines. (Exs. M–104 to M–107.)

248. The photos show that, among other things, both Machines were rusted. (Exs. M–105 at 008; M–107 at 003.)

249. On May 30, 2002 GECC sold Machines 50 and 51 to Rank International for a total of $4,000. (Exs. M–55 & M–66.)

250. If Machines 50–51 had been properly maintained and in good repair, their OLV at the time the Schedule was rejected would have been $10,000 each. (Ex. M–108.)

## II. GROUP 2 MACHINES

### A. Machines 3–11 at Gainesville, GA

251. Machines 3–11 were located at Hayes's Gainesville, GA, facility. (Ex. M–256 at 16.)

252. The Schedules relating to Machines 3–11 were rejected on January 15, 2002, within 60 days of the Petition Date. (JPTS at ¶ 2 & Machine List.)

253. On the Petition Date, two of the nine Machines were operable, though not in production, but there is no evidence of their identity. (Ex. M–245 at 59:2–8; 72:2–25; Ex. D–318 at 72:25–73:4; Ex. M–256 at 22; Ex. M–241 at 67:3–69:20.)

254. As of the Petition Date, the Machines were missing various unidentified parts. (Ex. M–245 at 70:16–71:21.)

255. When they were returned to GECC, Machines 3–11 were in the same condition as they had been on the Petition Date. (Ex. M–256 at 27.)

256. On March 25, 2002, Machines 3–11 were inspected. The report and photographs detail the deteriorated condition of the Machines. (Exs. M–87, M–88 & M–89.)

257. On May 22, 2002 GECC sold Machines 3–11 to J.R. Engineering for $4,000 each. (Ex. M–55 at GE 000179.)